LITTLE ROCK & FORT SMITH RY. CO. v. EUBANKS.

1. RAILROADS: *Liability to employes. Release from.*

A stipulation by a railroad company in a contract with an employe not to be answerable for the negligence of co-servants beyond the selection of competent servants in the first instance, and the discharge of such as prove to be reckless or incompetent, may be upheld as reasonable notwithstanding a statute which abolishes the old rule of non-liability for the acts and omissions of a co-servant; but a stipulation in advance releasing the company from its duty to furnish him a safe track, safe cars, machinery and materials and tools to work with, is void for being against public policy.

2. SAME: *Defective track. Proof. Jury.*

In an action by an employe against a railroad company for an injury caused by a defective track, evidence of the defect must be confined to the time of the casualty, if not by direct proof of the precise moment, by proof of such a state of facts so shortly before or after it as will induce a reasonable presumption that the condition was unchanged. In such actions the jury cannot infer the defect without proof.

3. SAME: *Liability to employe as to track.*

The measure of a railroad company's liability to its servants and to its passengers with regard to the track, machinery, etc., is not the same. They do not warrant to their servants the safe condition of their line and machinery. They guarantee only that due care shall be used in constructing and in keeping in repair and in operating the line, appliances and machinery.

4. SAME: *Contributory negligence. Proof of.*

Contributory negligence is a defense, and must be affirmatively proved by the plaintiff. The party injured is presumed to have been duly careful until the contrary is proved.

5. SAME: *Employe: Action for defects, etc.*

An employe of a railroad company cannot recover for an injury c used by a defect common to railroads, and such as could not have been avoided by reasonable care and attention.


APPEAL from *Franklin* Circuit Court.

Hon. G. S. CUNNINGHAM, Judge.


*J. M. Moore,* for appellant.

1. The evidence fails to show that there was any defect in the track at the time the accident occurred.

2. Testimony as to defects before or after the accident were not admissible. The testimony should have been confined to the time and place of the accident. *38 Mich., 541; 6 Cush., 396; 52 Barb., 269; 69 Me., 174; 39 Up. Can., Q. B., 264; 8 Or., 174; 8 Am. and Eng. Ry. Cases, 464; 1 Greenl. Ev., sec. 52; ib., 448; L. R. & F. S. Ry. v. Cavaness, MS.*

3.    The seventh instruction asked by defendant is un-questionably the law.   It is based on the familiar princi-ple that the servant assumes the risks usually and necessarily incident to the employment.   *41 Ark., 392–3; 35 ib., 614–15; 5 Am. and Eng. Ry. Rep., 478; 100 N. Y., 272; Patterson's Ry. Acc. Law, p. 342.*

4.    An employe who leaves his post of duty without instructions and voluntarily places himself in a position of danger, is guilty of contributory negligence, and can-not recover against his employer for any injury that may result to him.   *2 Thomps. on Neg., 1016–17, sec. 21.*

5.    At a trial of an action to recover damages for in-juries caused by the negligence of the defendant, it is incumbent on the plaintiff to prove :

*First*—That there was a breach or neglect of legal duty by the defendant.

*Second*—That the injury was the direct and natural re-sult and consequence of such neglect or breach of duty by the defendant.   *Black Proof and Pldg. in Acc. Cases, 2–3.*

6.    The contract executed by the appellee's intestate was legal and binding, and not against public policy.   *50 Ga., 470; 2 Head, 517; L. R. 10 Q. B. Div., 357; 11 Am. and Eng. Ry. Rep., 273; 52 Ga., 461; 57 ib., 513; Wood on Master and Servant, 792; 3 Wood on Rys., 1493.*

7.    The eleventh instruction asked by defendant was proper.   It directed the jury that the loss was to be based on the amount the plaintiff would naturally have received from his earnings.  This was the proper criterion by which to determine plaintiff's damage.  *3 Col., 102; 57 Penn. St., 337; 66 N. C., 154; Sh. and Red. on Negl., sec. 610 et seq.; 3 Wood on Railways, sec. 414.*

*Thos. B. Martin* and *Ed. H. Mathes*, for appellee.

1. Evidence that the switch was defective prior to the accident was admissible, unless the appellant had shown that it had been fixed since. No evidence having been introduced showing that the track had been repaired, the defects will be presumed to have continued.

2. The instructions given by the court on its own motion are proper and cover the whole law of the case. *41 Ark., 393; Hugh v. Tex. R. R, 10 Otto; 17 Wall., 557; 59 Penn. St., 239; 8 Allen (Mass.), 441.*

3. The contract set up in the answer as a bar to this action is no bar, because, first, the appellee was no party to that contract; and, second, the railway could not contract against its own negligence. *17 Wall., 367; 57 Penn. St., 337; 2 Head, 517; 11 Am. and Eug. Ry. Cases, 260; 39 Ark., 523; Patterson Ry. Acc. Law, 501.*

4. The seventh and ninth instructions asked by appellant were properly refused, because their substance had already been given in others. *28 Ark., 8; 37 ib., 108.*

5. There was no evidence upon which to base the eigth instruction asked by appellant.

6. The burden of proving contributory negligence was on appellant. *Ford v. R. R. Co., 110 Mass.; 15 Wall., 401.*

Smith, J. Appellee, as administratrix of J. C. Eubanks, sued appellant in the Franklin circuit court, alleging that she was the mother of the deceased, and administratrix, etc. That on the 7th day of October, 1884, her intestate was employed under a contract as brakeman on appellant's railway, and that on or before that time appellant's railway at the town of Ozark was in a defective condition, in this: "The defendant had constructed on its said road, and as a part of it on the track thereof at said place, a 'switch' and a

' frog,' which was so worn, ill-constructed and defective as to render it unsafe and unfit for use." The complaint alleges knowledge by appellant of these defects, and that by reason thereof, and the unsafe condition of the road at that point, and appellant's negligence, her intestate, while in the performance of his duty as brakeman under his contract, was thrown from the car, run over and killed.

The answer denies that the "switch" or "frog" was defective, ill-constructed or unfit for use, or that plaintiff's intestate was thrown from the car and killed by reason of any such defects; denies that the deceased was free from negligence, and alleges that his death was caused by negligence on his part. The answer also sets up and relies upon the following contract, executed by the deceased before his employment by the defendant as a release of liability.

"Clinton Eubanks having been employed, at his request, by the Little Rock & Fort Smith railway in the capacity of brakeman, hereby agrees with said railway, in consideration of such employment, that he will take upon himself all risks incident to his position on the road, and will in no case hold the company liable for any injury or damage he may sustain, in his person or otherwise, by accidents or collisions on the trains or road, or which may result from defective machinery, or carelessness or misconduct of himself or any other employe and servant of the company."

The issues were submitted to a jury, which returned a verdict for the plaintiff for $9360; upon which judgment was entered. A motion for a new trial was subsequently overruled; and a bill of exceptions was signed, saving the points hereinafter noticed.

The execution of the contract copied above was admitted by the plaintiff. But the court refused this prayer of the defendant: "If you find that before entering the ser-

vice of defendant, deceased executed the release, a copy of which is set out in defendant's answer, you are instructed that by reason of said release plaintiff will be precluded from recovering anything in this suit, and you will find for defendant."

A common carrier, or a telegraph company, cannot, by pre-contract with its customers, relieve itself from liability for its own negligent acts. This, however, may be on the grounds of its public employment. *Railroad Co. v. Lockwood, 17 Wall., 357; Penn. R. Co. v. Butler, 57 Penn. St., 335; L. R., M. R. & T. R. Co. v. Talbot, 39 Ark., 523; St. L., I. M. & S. Ry. v. Lesser, 46 ib., 236; 1 Wharton on Contracts, sec. 438.*

1. RAILROADS:<br>Release from liability to employe.

The validity of the contract before us is not affected by such considerations. The relation existing between the parties to it is essentially a private relation—that, namely, of master and servant. And the question is, whether a servant employed in the operation of dangerous machinery, can waive in advance the duties and liabilities which the master owes him, and which do not depend on contract, but spring out of the relation itself. Of course if he can waive them so as to bind himself, a waiver will also bar his personal representative; for the personal representative only succeeds to the right of action which the deceased would have had but for his death.

In 1880 the English parliament passed the "employer's liability act," the object of which was to make employers liable for injury to workmen caused by the negligence of those having the supervision and control of them. In *Griffith v. Earl of Dudley, 9 Q. B , Div. 357*, it was held that a workman might contract himself and his representatives out of the benefits of this act.

An opposite conclusion has been reached by the Supreme Courts of Ohio and Kansas. They hold that it is not com-

30–48

petent for a railroad company to stipulate with its employes, at the time of hiring them, and as a part of the contract, that it shall not be liable for injuries caused by the carelessness of other employes. (*Lake Shore & M. L. R. R. Co. v. Spangler, Sup. Ct. of Ohio, 1886, 8 N. E. Rep., 467; Kansas Pacific Ry. Co. v. Peavey, 29 Kan., 169; S. C., 44 Amer. Rep. 630; S. C., 11 Amer. & Eng. R. R. Cases. 260.*) In the notes to the last mentioned case, as reported in the two series of reports last cited, the substance of *Griffith v. Earl of Dudley* is set out. This, however, is not precisely the same question we have to deal with. For the negligence of a fellow sesvant is not in fact and in morals the negligence of the master, although by virtue of a statute it may be imputed to the master. It is impossible for the master always to be present and control the actions of his servants. Hence, a stipulation not to be answerable for their negligence, beyond the selection of competent servants in the first instance, and the discharge of such as prove to be reckless or incompetent, might be upheld as reasonable, notwithstanding a statute might abolish the old rule of non-liability for the acts and omissions of a co-servant.

But the Supreme Court of Georgia have, in several cases, sustained contracts like the one before us as legal and binding upon the employe, so far as it does not waive any criminal neglect of the employer. The effect of these decisions is, that the servant of the railroad company, for instance, not only takes upon himself the incidental risks of the service, but he may, by previous contract, release the company from its duty to furnish him a safe track, safe cars, machinery and materials, and suitable tools to work with. *Western & Atlantic R. Co. v. Bishop, 50 Ga., 465; W. & A. R. Co. v. Strong, 52 ib., 461; Galloway v. W. & A. R. Co., 57 ib., 512.*

On the other hand, in *Roesner v. Hermann, 10 Bissell, 486; S C., 8 Federal Reporter, 782,* a contract by a master against his own negligence, was declared to be void as against public policy. GRESHAM, J., saying : "If there was no negligence, the defendant needed no contract to exempt him from liability ; if he was negligent, the contract set out in his answer will be of no avail." Compare *Memphis & Charleston R. Co. v. Jones, 2 Head, 517,* where it was decided that such a contract would not protect the master against gross negligence.

It is an elementary principle in the law of contracts that *"modus et conventio vincunt legem,"* the form of agreement and the convention of parties overide the law. But the maxim is not of universal application. Parties are permitted, by contract, to make a law for themselves only in cases where their agreements do not violate the express provisions of any law, nor injuriously affect the interests of the public. *Broom's Legal Maxims [*543]; Krettle v. Newcomb, 22 N. Y., 249.*

Our constitution and laws provide that all railroads operated in this state shall be responsible for all damages to persons and property done by the running of trains. *Const. 1874, art. 17, sec. 12 ; Mansf. Dig., sec., 5537.*

This means that they shall be responsible only in cases where they have been guilty of some negligence. And it may be questionable whether it is in their power to denude themselves of such responsibility by a stipulation in advance. But we prefer to rest our decision upon the broader ground of considerations of public policy. The law requires the master to furnish his servant with a reasonably safe place to work in, and with sound and suitable tools and appliances to do his work. If he can supply an unsafe machine, or defective instruments, and then excuse himself against the consequences of his own negligence

by the terms of his contract with his servant, he is en-
abled to evade a most salutary rule.

In the English case above cited it is said this is not
against public policy, because it does not affect all society,
but only the interest of the employed. But surely the state
has an intetest in the lives and limbs of all its citizens.
Laborers for hire constitute a numerous and meritorious
class in every community. And it is for the welfare of
society that their employers shall not be permitted, under
the guise of enforcing contract rights, to abdicate their
duties to them. The consequence would be that every
railroad company and every owner of a factory, mill or
mine, would make it a condition, precedent to the employ-
ment of labor, that the laborer should release all right of
action for injuries sustained in the course of the service,
whether by the employer's negligence or otherwise. The
natural tendency of this would be to relax the employer's
carefulness in those matters of which he has the ordering
and control, such as the supplying of machinery and ma-
terials, and thus increase the perils of occupations which
are hazardous, even when well managed. And the final
outcome would be to fill the country with disabled men
and paupers, whose support would become a charge upon
the counties or upon public charity.

2. SAME:
Defective
track. Evi-
dence.
Jury.

II. The next question is, whether the testimony is
sufficient to support the verdict. The freight train, upon
which the deceased was a brakeman, was bound for Fort
Smith, but had stopped at Ozark station about 11 p. m.,
and the trainmen were engaged in switching off cars from
the main track to a side track. The plaintiff's intestate
was assisting in this operation, being on top of one of the
cars with a lantern in his hand. The evidence does not
show clearly what it was that caused him to fall between
the cars. But it is probable that he was thrown off by the

jolting of the car, and that this jolting was produced by the car having left the track. The theory of the plaintiff's case was that there was a defect in the "switch," or in the "frog," or in both, which caused the car to run off at that particular place.

The substance of the testimony on this point was as follows :

J. V. Bourland, for plaintiff, testified : "It was about 11 o'clock at night when I rushed to the railroad. They were taking deceased from under the wheels. It was about twelve to fifteen feet from the 'frog' towards the depot. He was lying across the track. Could see where the border or flange of the wheel cut the rail and frog; think the car got off at the frog, and it jumped across the ties. Heard trains had got off there before; knew of as many as two or three getting off there. Conductor and two or three others were there. Don't know how many cars were attached to engine. Think both trucks of second car from rear of train were off; the wheels on one side of the car were off. Don't know whether the track is in good or bad repair. About fifteen or twenty feet south of the frog is where the man was killed. I know of no cars being off there before. Judge from indentations on the ties; don't know how long they had been there; Judge from the scar on the frog that the car wheels ran on top of it and the track about two feet. Don't know how long the scar had been there, or if it had been made by this car; am satisfied the scar I saw on the frog was made by this car running off. Did not examine on the outside of ties or switch rail to see if there were any indentations on the ties. Was there next morning. Saw scars on the old ties where the accident occurred. Two or three days afterward these old ties were gone and new ones in. Live at Ozark. Was never employed on a railroad."

Henry Woollum: "Don't remember exact time of the accident. Was in Argenta at the time running as fireman on an 'extra.' Was at Ozark six or eight days before going into defendant's employ. Don't know as to condition of switch at time of accident, but afterwards it was bad. Shortly after the accident was yard-master of this yard, and was notified by engineers that this switch was in bad condition. Notified section foreman, whose duty it was to fix it; also told McLoud, road-master. The train-dispatcher gave notice to me two or three times to run slow over that switch. This was the train-dispatcher under Mr. Hartman, three years ago, while I was running an engine. [Evidence of above notification of condition of track, switch, etc., objected to; objection overruled and exception saved.] The defect in the switch was that the switch rail was one and one-half inches lower than the main track. An engine got off the track there one night and I tried two or three times to get over and could not do so. The foreman came down and fixed it. The wheel would drop between the switch and main rail. This was two months after the accident occurred, and while I was yard-master. It would throw the train to north side of track; could throw it south. Kile, the section boss, fixed it. Did not notice ties cut by wheels. Switch rails are between main rails of track. It was a 'split' switch. Engine was hard to get over; cars would go over because so much lighter. It is the duty of road-master and section foreman to look after track. I knew there was a defect there, but not what it was. Was notified switch was defective after accident occurred; could not see any defects. I went and looked. Every time engine would go off to the north side. Have been in railroad business about nine years. This frog and switch are the kind usually used. I made no report of defects to officers of road. Looked at track inside of fifteen

days after accident. Had coal cars off here while engineer. Cause of engine jumping was that switch rail was lower than main rail."

None of the remaining witnesses for the plaintiff professed to have any knowledge of the condition of the track; but two of them stated that they had seen a car off the track about the same place recently before the accident occurred.

For the defendant the following witnessess testified:

L. Treadway: "Was conductor of the train and handling the switch, switching cars; gave signal to back; heard jumping and signaled to stop. Went down to where car was; saw it was Eubanks under the car, and said: 'My God! How did he get over there?' Saw signal from man on top of second car from rear end to 'come back;' did not see him afterwards. He was killed eight or ten feet east of frog, and one hundred and eight or ten feet east of switch; body was under last pair of trucks of second car at the rear of train. Had been handling switch thirty-five or forty minutes. It was all right and a good one. I examined car and track after the accident; both were all right. I pulled the car over the ties up to the frog to get it back on. The track at this point has been good ever since I've been on the road—eighteen months. The car rolled about six feet after it jumped; only one pair of trucks off. He was my rear brakeman, and his position was rear-brakeman on train or caboose. He ought to have stayed in rear of the train and caught cars as they came back. He was in the head brakeman's place, and I gave him no orders to change. Brakemen were all under my orders. I did not know of the change until after his death. We passed over this track ten or fifteen times that night before the accident. Car ran off because of something on the track to throw it, not on account of de-

fective 'frog.' The signs on the ties were made by us in trying to get the car back on track. It is the duty of the yard-master and section boss to look after the track; McLoud and Kyle filled those positions; both competent men. There was no defect in the switch, frog or track in any respect. Am not in defendant's employ now. Had three brakemen. It was necessary for some one to be on top of car with engine. I would be willing to swear point blank that it was the body of the man that threw the car off. It is a brakeman's duty to do work anywhere on the train when necessary. After a brakeman has been assigned to a position he has no right to change places without orders from conductor. I gave no such orders in this case, nor knew of it until I found deceased dead."

McLoud: "Am road-master, and have charge of the track. Was at place of accident the morning after it occurred; examined track, switch and frog, and found everything all right. Nothing has been done to change switch, frog, or anything else, since the accident. New switch ties were put in a day or two before injury, and were all right; trains ran over the track the day and night before the injury; nothing was the matter with the track. It is necessary for the point of the switch rail to be a little lower than main rail, so as to slip under in order to make the switch. If a car passes the frog and gets off, it would require something to throw it off; both switch, frog and track were in good condition at the time, and are now. If switch is being made and frog is defective, and the car leaves the track, it would go off on north side. There is a little open place between the rails at frog, and if the wheels strike the point of frog it would go through this and off the north side. Mr. Kyle is section foreman, and a competent man."

Kyle: "Was section foreman, and duty to keep track in

good order. Came down morning after accident, gauged the track and found it all right; switch, frog and track were in good condition. I put in ties day before the accident, surfaced, leveled and gauged the track. All regular trains passed over day before the accident. No report was ever made to me that track was defective. About two months before the accident a king-bolt broke on a lumber car and threw it off near the water tank. The frog is east of switch eighty feet. I put in new ties October 8th; the accident occurred next night. Put new ties from point of switch up to and five under the frog. I have done no work there since. Have been railroading twenty-one years."

John Edwards: "Was a hand under Mr. Kyle. There was nothing wrong with the switch, frog or track; they are the same to-day as then, no work having been done there since."

The evidence of Dock Smith and Charles Cole was in substance same as Edwards'.

Aside from the testimony of Woollum, there is nothing here that tends to prove the existence of the defect complained of; and Woollum's testimony, when analyzed, will be found to be vague, inconclusive and contradictory, based largely on hearsay, and relating chiefly to times long antecedent or subsequent to the accident. He says expressly that he was not acquainted with the condition of the switch at the time of the accident. His statements as to its condition three years before the trial and some twenty-one months before Eubanks was killed, should have been excluded. Proof of what occurred two months afterwards was also irrelevant to any issue that was before the jury, being too remote to afford any fair inference.

The evidence in such cases should be confined to the time, place and circumstances of the injury and negligence

then and there. *Parker v. Portland Publishing Co.*, *69 Me.*, *174; G. R. & Ind. Ry. Co. v. Huntley*, *38 Mich, 341.*

Where a defective track is alleged to be the cause of the casualty, it is often impracticable to adduce evidence of the condition of the track at the precise moment the casualty occurred. It is enough to prove such a state of facts shortly before or after as will induce a reasonable presumption that the condition is unchanged.

Woollum had not examined the track before the accident; nor can his examination afterwards be brought nearer than fifteen days. Assuming that there was no change of condition within that time, the only defect he was able to discover was that the switch rail was a little lower than the main rail. He does not seem to be very positive that this was a defect which could be remedied, and the evidence for the defendant shows that it is necessary for the point of the switch rail to be lower than the main rail, so as to slip under in order to make a switch.

The evidence, then, is lacking on a material point which it was essential for the plaintiff to establish, that the appliance was defective. It may be said this was a question for the jury. But the jury could not infer it without proof.

3. Liability to employe as to track. The duties of a railroad company to its servants in these matters are not measured by the same rule that is applied in the case of passengers. "Railways do not warrant to their servants the safe condition of their line and machinery; and they guarantee only that due care shall be used in constructing and in keeping in repair, and in operating the line, appliances and machinery." *Patterson's Railroad Accident Law, sec. 284, and cases cited; L. R. & Ft. S. Ry. Co. v. Duffey, 35 Ark., 602; St. L , I. M. & S. Ry. v. Harper, 44 ib , 529; St. L., I. M. & S. Ry. v. Morgart, 45 ib., 318; Probst v. Delawater, 100 N. Y., 266.*

So far as appears, the deceased lost his life by a casualty,

which, in the absence of evidence showing that the defendant was in fault, must be ascribed to the ordinary risks incident to his employment. *L. R. & Ft. S. Ry. v. Townsend, 41 Ark., 382.*

The testimony fails to establish the defense of contributory negligence. Eubanks merely exchanged places with one of his fellow-brakemen, without orders from the conductor. Although it is probable he would not have been injured if he had remained in the position to which he had been assigned, yet it is not shown that the place he assumed was more dangerous than the one he vacated. In this connection we notice the court charged that the plaintiff must prove that her intestate was free from fault or negligence. This was an error in favor of the defendant, and we only call attention to it for the purpose of another trial. Contributory negligence is a defense to be affirmatively proved. It will be presumed the injured party was in the exercise of due care until the contrary is made to appear.

In other respects the jury was properly charged, except that the court should have granted this prayer of the defendant: "If you find the defects relied on in this action were such as are common to railroads, and such as could not have been avoided by reasonable care and attention on the part of defendant, you will find for defendant."

A direction of this sort was necessary to guard the jury against being misled by the testimony in relation to the difference in height between the main and switch rails.

Reversed and a new trial ordered.