ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY
*v.* COKE.

Opinion delivered April 5, 1915.

1. EVIDENCE—CROSS-EXAMINATION—DISCRETION OF COURT—PERSONAL INJURY ACTION.—In a personal injury suit, it is proper for the court to refuse to permit further cross-examination of a physician who was a witness, as to technical matters relating to the injury, when the witness had already been thoroughly interrogated on the points involved.

2. TRIAL—REMARKS OF TRIAL JUDGE—SPECIFIC OBJECTION.—The trial court stopped counsel for appellant in his cross-examination of a witness with the remark, "we are not interested in that matter and it is not material to the case;" *held*, since it was not improper for the court to stop counsel, if appellant wished to predicate error upon the particular remark of the court, he should have objected thereto specifically.

3. EVIDENCE—CONDITION OF RAILROAD BRIDGE.—In an action for damages for personal injuries caused by the collapse of a railway

bridge, when the bridge was reconstructed, after the accident, with the same timbers that were used in it before the same, evidence that the timbers were rotten five months after the accident is admissible as showing the condition of the bridge at the time of the accident.

4. MASTER AND SERVANT—INJURY TO SERVANT—STRUCTURAL DEFECT.— It is the duty of a master to exercise ordinary care to furnish its servant with a safe place in which, and with safe appliances with which, to do his work, but where an injury results from a defect that is not structural, then, in order to render the master liable, it must first appear that he knew, or by the exercise of care should have known of such defect.

5. MASTER AND SERVANT—MASTER'S DUTY OF CARE.—A railroad company will be liable for damages resulting from the use of a defective rail, if by the exercise of ordinary care, the defect could have been discovered, regardless of the length of time the rail had been used.

6. EVIDENCE—SUBSEQUENT REPAIRS AND CHANGES IN CONSTRUCTION.— Although it is error, in a personal injury action to admit testimony to the effect that after an accident there was a change in the appliance or in the manner of construction and operation of the structure or appliance causing the injury, it is not error, where the injury was caused by the collapse of a railway bridge, to permit plaintiff to show the manner in which temporary braces were used in reconstructing the bridge, which were not used in its original condition.

7. RAILROADS—INJURY TO EMPLOYEE—CONCURRENT CAUSES.—When under the pleadings and evidence plaintiff was injured by the concurrent causes of a defective rail and bridge, an instruction will be held erroneous, which omits the issue of either one of the two concurrent proximate causes.

8. RAILROADS—INJURY TO EMPLOYEE—DAMAGES.—In an action for damages for personal injuries, evidence held sufficient to show defendant to have been negligent and to warrant a verdict for $25,000 damages.

9. MASTER AND SERVANT—FEDERAL EMPLOYER'S LIABILITY ACT.—Although a complaint in a personal injury action does not state facts sufficient to make the Federal Employer's Liability Act applicable, this court would treat the same as applicable if the evidence showed that plaintiff, at the time of his injury, was engaged in interstate commerce.

10. NEW TRIAL—NEWLY DISCOVERED EVIDENCE—DILIGENCE.—A new trial will not be granted on the ground of newly discovered evidence, when appellant before the trial, could have discovered the same

by the exercise of reasonable diligence, and could have developed at the trial, all that was later claimed to be newly discovered evidence.

Appeal from Desha Circuit Court; *Antonio B. Grace,* Judge; affirmed.

### STATEMENT BY THE COURT.

Appellee sued appellant for personal injuries, alleging that appellant maintained its railroad track upon a bridge constructed over Lost Chain Bayou; that the bridge was constructed of wood and timbers, with wooden bents about fourteen feet apart, placed on mud sills which were placed on the surface of the ground below water which was about two or three feet deep; that the bridge was improperly constructed, the bents and sills not being properly braced for the safe running of trains and locomotives thereon; that by reason of such improper construction, it was of insufficient strength; that the rails, especially at the west end, were old, defective and insufficient; that they were not of sufficient weight, and were insecurely fastened and braced; that the ties were unsound; that the defective condition of the bridge was well known to the appellant; that on March 20, 1914, appellee was in the employ of the appellant as conductor, and was in charge of its train; that the train consisted of about twenty cars, together with the caboose and engine; that the cars were loaded with gravel and ballast; that while the train was passing over the bridge above mentioned at ordinary speed, a defective rail broke and the bridge collapsed, causing the train to fall a distance of twelve or fifteen feet; that the appellee was in the caboose at the time performing his duties as conductor, and was thrown to the floor and received serious and permanent injuries which he described. The prayer was for damages in the sum of $35,000.

Appellant answered, denying specifically the allegations of negligence alleged in the complaint, and the allegations as to the injuries and resulting damages, and set up that the plaintiff assumed the risk.

The testimony on behalf of the appellee tended to show that on March 26, 1914, the appellee was conductor on a train such as described in his complaint, and that while passing over the bridge over what is known as Lost Chain Bayou, the bridge collapsed, precipitating the caboose, with other cars, into the bottom of the bayou, and causing the injuries of which the appellee complains.

The bridge was constructed of heavy pine timber, and the track laid on top of this bridge timber. The bridge did not have any cross braces lengthwise with the bridge from bent to bent. It would not be as strong without these lengthwise braces as with them. The bridge was built three or four years before the accident of March 26, 1914.

One witness who got there within an hour after the bridge fell, stated as follows: "I noticed the broken rail; it looked like it had been an old, rusty break along the side and underneath the rail, it did not extend to the top of the rail." This witness was shown exhibit "C," and asked "if that is the way a railroad bridge of this kind should be constructed," and answered, "Yes, that picture shows that the braces run lengthwise from bent to bent." Witness stated that it had been about twenty-five years since he worked as a bridge carpenter. At the time of giving his testimony, he was a day laborer.

Another witness on behalf of the appellee testified that he was a civil engineer, and had seen the appellant's bridge at Lost Chain Bayou several times. Witness was on the bridge about two months before it fell. He was about half-way across when he saw a gravel train coming. He got on the end of a cap while the train passed. The bridge shook so it scared witness, and he started to jump off, but the water kept him from it. Witness, after the accident, noticed a broken rail, but did not examine it closely. It wasn't cracked or anything, but just a fresh break.

The appellee testified that he was conductor on the train which at the time of the accident was running about twelve miles an hour. He was sitting at the end of the

caboose, and all at once was thrown "like dynamite and landed out in the middle of the floor about twelve or fifteen feet on his right hip." It knocked the breath out of him for quite a time. After about six hours, a caboose and engine came and took plaintiff home to McGehee. Appellee then tells about his being sent to St. Vincent's Infirmary at Little Rock, and about his treatment there; and details the nature of his injuries and sufferings, which will be referred to in the opinion.

The appellant reserved exceptions to certain rulings of the court in the admission of testimony and in refusing certain of its prayers for instructions, which we will note in connection with the other assignments of error in the opinion.

The jury returned a verdict in favor of the appellee in the sum of $25,000, and this appeal seeks to reverse the judgment entered in his favor for that sum.

*E. B. Kinsworthy, J. C. Knox* and *T. D. Crawford,* for appellant.

1.     The court erred in refusing to permit cross-examination of Doctor Marshall with reference to the origin of the nerve that affects the bowel movement, and in refusing to permit appellant to interrogate the witness further on this point.

The questions as to the origin of the nerves which control the rectum and bladder and scrotum, and as to the effect of a displacement of the vertebrae which control the nerves of these organs, was vitally important. The remarks made by the court were calculated to prejudice the jury against the defense which appellant was endeavoring to establish.

2.     The court erred in admitting the testimony of the witness Bankston with reference to the condition of the bridge at a time subsequent to the injury. 48 Ark. 460.

3.     Instruction 8 requested by appellant should have been given. No instruction given by the court called attention to the necessity of proving that the defect in the rail must have been known to the defendant, or must have

been of such character that it should have been known. 78 Ark. 505; 79 Ark. 437; 95 Ark. 477; 54 Ark. 389.

4. The testimony tended to show that the proximate cause of the wreck and of plaintiff's injury was the breaking of a rail, and not any defective condition of the bridge, and that if the train had remained upon the track, the wreck and resulting injury would not have occurred. The ninth instruction therefore should have been given. 79 Ark. 76.

5. Appellant was entitled to an instruction to the effect that proof of subsequent repairs of the bridge in a particular method was inadmissible to establish negligence in the original construction of the bridge. 70 Ark. 179; 79 Ark. 388; 78 Ark. 147; 82 Ark. 555; 89 Ark. 586; 105 Ark. 205; 108 Ark. 483. The court therefore erred in refusing to give instruction 11.

6. There was no testimony tending to prove negligence in using the size of rails employed in the place where the accident occurred, and the court erred in refusing to give appellant's thirteenth request for instruction.

7. It was error to refuse to give instruction 16. The court's sixth instruction was a general one to the effect that the employee assumes the risks of injury ordinarily incident to the employment, whereas, the 16th instruction requested is more specific and reaches the essential point involved in the case. It should have been given. 80 Ark. 438; *Id.* 454; 82 Ark. 499; 87 Ark. 531; 90 Ark. 247; 98 Ark. 17; 96 Ark. 206.

8. Instruction 17 should have been given. The testimony of the doctors with reference to the history of the case, as given them by the plaintiff and his attending physician, was inadmissible, and the jury should have been told that those statements were incompetent to prove plaintiff's condition, etc. 108 Ark. 394.

9. The evidence is insufficient to support the verdict. There is no testimony which tends to prove that the bridge was in a defective condition at the time of the accident, nor is there any testimony which tends to prove that the rail was cracked in such a way that it should have

been seen upon reasonable inspection. In the absence of such testimony, there was no case to submit to the jury.

*Hoeppner & Young,* for appellee.

1. The court was right in not permitting appellant to further cross-examine Doctor Marshall with reference to the origin of the nerve that affects the bowel movement. The character of examination which counsel was pursuing could have only one effect, and that was to confuse the jury.

2. The testimony of Bankston that he examined the bridge, or some timbers in it, subsequent to the injury, was not for the purpose of showing the condition of the bridge at the time of the accident, but was in rebuttal of testimony on the part of appellant to the effect that after the accident the bridge was rebuilt of the same timbers, etc., and that these timbers at the time of rebuilding were sound and in first-class condition. His testimony was admissible.

3. The court's instructions No. 4 and others, already given, covered the same matters as requested by appellant in its eighth instruction; hence there was no error in refusing to give it.

4. The court properly refused to give instruction 9, requested. That instruction improperly assumes that the collapse of the bridge was caused solely by a rail breaking, when in fact it is alleged and proved that the bridge was improperly constructed. The decision relied on by appellant, 79 Ark. 76, is rendered inapplicable by the act of March 8, 1911.

5. There was no error in refusing instruction 11. It was not claimed by plaintiff that longitudinal braces were necessary, and the introduction of any such testimony was purely incidental and explanatory of the methods used in rebuilding the bridge. No objection was made to the testimony, nor exceptions saved. 82 Ark. 555.

6. The thirteenth instruction was properly refused. The testimony as to the size of the rails was a mere incident in the testimony, and was brought out by appellant's

witnesses.   The size of the rail had nothing to do with the case.

7.   The question of assumption of risk was fully covered by the court's sixth instruction, and instruction 16 requested by appellant, which improperly assumes that the sole cause of the accident was the breaking of the rail, was properly refused.

8.   The evidence did not warrant the giving of instruction 17.   No "history of the case" was related to the doctors.   They got the symptoms from Coke, and on these symptoms gave their opinions as experts as to the result, and they did not testify as to the cause of the accident, and whether or not it was caused by a broken rail, rotten timbers or the improper construction or maintenance of the bridge.   108 Ark. 387, and cases cited.

9.   The testimony supports the verdict.   It shows that the bridge collapsed when the train was passing over it, and that the plaintiff, through no fault of his, was seriously and permanently injured.   It shows also that the rails were too light and that at least one of them "had an old rusty break along the side and underneath the rail."

Wood, J., (after stating the facts).   (1)   Appellee's complaint contains the following allegations as to his injuries:   That "on being thrown to the floor as aforesaid, plaintiff sustained serious and painful injuries to his right hip, legs, arms, head, body, spine, spinal cord and dislocation of one of his vertebra, resulting in a curvature, and as a consequence, the nerves, muscles and tissues in the region of such dislocation are permanently injured."   That "plaintiff also sustained severe and painful injuries to his kidneys, bladder and entire nervous system, and said injuries are permanent and lasting."   That "during all of this time, plaintiff has suffered great and excruciating pain and will continue to do so throughout his life."   Appellee testified that by reason of his injuries he had lost control of his bowels and bladder and was rendered impotent.

Doctor L. L. Marshall, a witness for appellee, testified that he was a physician and surgeon, and had treated the appellee for the injuries he sustained since about the 2d or 3d of June, 1914. He stated that, by reason of the displacement of the nerves caused by the dislocation of one of the vertebra, appellee had lost control of his bladder and bowels and genital organs. He described minutely the human vertebrae, together with the ligaments and muscles which hold them together, and the effect that the tearing of these muscles and the nerve pressure in a certain region of the back, which he pointed out, would have on the organs lying in the pelvic region, or lower cavity of the body. After minutely describing the anatomy of the human back, his testimony proceeded as follows:

"It would seem from his general condition that the sacral plexus of nerves is involved directly in front of this backbone or pudic nerve, a great and small sciatic nerve and its branches which control the lower limbs, the perineal nerves. In each one of these backbones, there is a hole on each side where the nerves from the cord come through, and where they come through in this fifth lumbar vertebra and from the dorsal vertebrae, they go to form a plexus—the nerves coming together form a net-work. Off this network of nerves, come the different nerves that go down to the legs and to the genital organs and into the rectum, and these nerves that come off this plexus subdivide and branch out like the branches of the trees, some governing some certain muscles and others other muscles."

The cross-examination proceeded as follows:

Q. Do the nerves affecting the different parts of the body all come from the same vertebrae?

A. Oh, no.

Q. Which vertebrae, for instance, would those nerves come from that affect the rectum or bowel movement?

A. This plexus is formed by the nerves that come out of the dorsal vertebra.

Q.   Which one is the dorsal vertebrae?

A.   There are seven cervical and twelve dorsal. The first dorsal would be the eighth vertebra, and they give out nerves which join all the way down—and five of the lumbar vertebra which follow it—and nerves come through each of the lumbar vertebra, and these nerves come in together to form a plexus where the nerve fibres all join to form this plexus, and off this plexus come the other nerves.

Q.   I want to find from which of the vertebra this nerve eminates that affects the bowel movement?

A.   Well, it comes from this plexus of nerves.

At this point, the court remarked: "We are not interested in that matter; it is not material to this case. Let's stop the discussion of that point."

The appellant duly excepted to the ruling of the court and its first ground of the motion for a new trial is as follows:

"That the court erred in holding of its own motion upon cross-examination of the plaintiff's witness, Dr. L. L. Marshall, that testimony relative to the emanation of the nerve that affects the bowel movement was immaterial and irrelevant to this case, and in refusing to permit defendant to further interrogate the witness on this point."

The court did not err in refusing to allow further cross-examination of Doctor Marshall. The last question asked the witness on cross-examination showed that the purpose was to ascertain "from which of the vertebra this nerve emanates that affects the bowel movement," but the appellant had already ascertained this fact by other questions propounded to the witness. The witness had already been asked which vertebrae the nerves came from that effected the bowel movement, and had answered that they came "out of the dorsal vertebrae." The witness, with great minuteness and with technical terminology, had described and pointed out the various ligaments, muscles, bones and nerves of the human back, and had pointed out and explained in detail the region of the back where appellee was injured. The expressions

used in his testimony show that he was demonstrating before the jury by pointing out on appellee's back, or the back of some one used for the purpose of the demonstration, the particular vertebra or backbone that was dislocated. He showed that this was the 21st vertebra from the top, or what was technically known as the second lumbar vertebra or system of bones constituting the spinal column. He explained that when the ligaments and muscles binding the joints of the backbone together were turned loose, allowing these joints to slip, the entire nervous system of the pelvis, or cavity where the intestines lie, would be affected, and that such was the condition of appellee as the result of the injury he received. The testimony of other physicians on behalf of appellee corroborated the testimony of Doctor Marshall as to the particular vertebra or backbone that was dislocated, and as to the effect such dislocation had upon the nerves controlling the organs in the pelvis. A more extended examination of the witness on cross-examination was not called for, and it was within the discretion of the court to stop the examination at that point. The doctors used such terms as "this vertebra," "these backbones," "nerve pressure in this region of the back," "these nerves," etc., showing that they were demonstrating before the jury the particular portions of the body of appellee that were affected by his injury; and to have continued further interrogatories along this line on the cross-examination would have been useless, and could have had no other effect than to confuse and mislead the jury by a superabundance of scientific and professional terms, of which the ordinary juror has no knowledge. The only purpose that appellant could have had in extending the investigation along this line would have been to show that the appellee's witnesses were mistaken in their conclusions as to the effect that would be produced by a dislocation of what they designated as "the second lumbar vertebra," or mistaken as to such vertebra being dislocated. The appellant introduced its expert witness, Doctor Smith, who had examined the appellee when he was brought to the hospital on the sec-

ond day after he received his injury, and who described, with the same technical terminology, the nature and character of his injuries, and the results thereof as he ascertained them. The effect of his testimony was to show that if there had been a dislocation of the second lumbar vertebra such as was described by the witnesses for the appellee, and a consequent pressure on what the doctors call the "inguinal" and the "pudic" nerves, the results would have been not only such as that described by the witnesses to that point for the appellee, but if there had been a complete displacement such as they described, there would have been a total paralysis from that point down. The testimony of the expert witness for appellant was to the effect that there was no such paralysis and loss of sensation as would have been the case had the second lumbar vertebra been dislocated as the result of the injury in the manner described by the expert witnesses who testified on behalf of the appellee. Thus, the doctors testifying for the respective parties differed as to the results of the injury which the appellee received, and the jury accepted the testimony of the witnesses for the appellee rather than the appellant, which it was their province to do. But the appellant was not prejudiced by the ruling of the court in closing the cross-examination in the manner indicated, because it was evident that nothing further would be elicited that had not already been testified to, and appellant had proceeded far enough to enable it to bring out the points which it might desire to controvert.

(2) The appellant contends that the remarks made by the court "were calculated to prejudice the jury against the defense." The court in making its ruling should not have stated, "we are not interested in that matter, and it is not material to this case." But no specific objecion was made to these remarks, the appellant only excepted generally to the ruling of the court. As the court's ruling in stopping the cross-examination was not erroneous, it was the duty of the appellant, if it desired to predicate error upon the particular remarks in which the

ruling was couched, to call attention to such remarks by specific objection.

(3)  The appellee's injury occurred on March 26, 1914.  The trial was had on August 29, 1914.  Witness Bankston was permitted to testify, over the objection of appellant, that on the 17th day of August, 1914, he examined the timbers of the bridge with reference to their soundness and "noticed the uprights were rotten where they sat on the mud-sill."  He "picked up a rod, and in one instance shoved it clear through."  Before this testimony was introduced, witnesses had testified on behalf of appellant that after the accident, the bridge was rebuilt of the same timbers with which it was originally constructed, and that these timbers at the time of the rebuilding were "sound and in first-class shape."  The testimony of Bankston was strictly in rebuttal of the above testimony on behalf of appellant, as it tended to show that the timbers were not sound, and in first-class condition at the time the bridge was rebuilt.  Moreover, the testimony was competent as tending to prove that timbers in the bridge at the time of the accident were unsound.  In *St. Louis, I. M. & S. Ry. Co.* v. *Thurman,* 110 Ark. 188-194, a defective track was alleged to be the cause of the accident.  In that case we held that "evidence is admissible of the condition of the track before and at a time five months after the accident, in order to show the condition of the track at the time the accident occurred."  See, also, *Little Rock & F. S. Ry. Co.* v. *Eubanks,* 48 Ark. 460-474; *St. Louis, I. M. & S. Ry. Co.* v. *Freeman,* 89 Ark. 331.  That principle rules here.  We said in *Railway Co.* v. *Thurman, supra,* "It would be unreasonable to conclude that railroad ties that were in first-class condition at the time the wreck occurred could deteriorate so rapidly as to be rotten within five months thereafter.  It might be said as a matter of common knowledge that such is not the nature of railroad ties.  It would take longer than five months for the disintegration of the timber out of which railroad ties are made."  The same may be said of the timber con-

stituting uprights with which railroad bridges are constructed.

Appellant complains because the court refused its eighth prayer for instruction, which told the jury that "it must appear that the rail which was cracked was the same rail that broke," and, "even if you should find this by a preponderance of the evidence, it must further appear that the defendant knew of the existence of this defect, or, by the exercise of ordinary diligence, could have known—that is to say, it must appear from a preponderance of evidence that this rail had remained in the track in a defective condition for such a great length of time that the defendant's servants could not now be heard to say that they did not know it."

One of the witnesses for the appellee testified: "I noticed the broken rail; it looked like it had been an old, rusty break along the side and underneath the rail, it did not extend to the top of the rail."

(4-5) It was also shown that the bridge had been constructed only three or four years previous to the accident. While the testimony on behalf of the appellant tended to show that the break in the rail was a fresh one, and the rail was not defective, still, the testimony of appellee, taken in connection with the testimony for appellant on this point, made it an issue for the jury as to whether or not the defect in the rail was a structural one, and therefore such a defect as the master knew, or should have known when the rail was first laid. As was said in *Arkadelphia Lumber Co.* v. *Smith*, 78 Ark. 505-511: "The jury might reasonably have inferred from the evidence that the defect in the track was made by the construction of it, and not by usage, and that it was the proximate cause of the accident and injury. In that event, the appellant was chargeable with notice of the defect, and liable to its employees injured on account thereof without any previous notice or knowledge of the same." But even if there were no evidence to warrant a finding that a defect in the rail was structural, the appellant's eighth prayer was still calculated to mislead the jury, and therefore

erroneous.   It is the duty of the master to exercise ordinary care to provide the servant a safe place in which, and safe appliances with which, to do his work, but where the injury to the servant results from a defect that is not structural, then, in order to render the master liable, it must first appear that he knew, or by the exercise of ordinary care should have known, of such defect.  See *Bauschka* v. *Western Coal & Mining Co.*, 95 Ark. 477, and cases cited.  *St. Louis, I. M. & S. Ry. Co.* v. *Andrews,* 79 Ark. 437-439; *Ry. Co.* v. *Davis,* 54 Ark. 389-393.  The above idea was correctly embodied in the prayer, but in explaining its meaning, it erroneously told the jury that "it must appear from a preponderance of the evidence that the rail had remained in the track in a defective condition for such a great length of time that the defendant's servants could not now be heard to say that they did not know it." The vice in this part of the instruction is in the use of the words "such a great length of time."  This language was argumentative and misleading.  If ordinary diligence could have discovered that the rail was in a defective condition, even though it had been used but a very short time, it would be sufficient to fix liability for negligence in not maintaining the track in a safe condition.  The test was whether, by the exercise of ordinary care, the defect could have been discovered, regardless of the length of time that the rail had been used.

The court refused appellant's prayer No. 9, which is as follows:

"It is immaterial in this case whether the bridge, itself, was properly constructed and maintained, unless it appears from a clear preponderance of the evidence that if it had been constructed with reasonable care, it would not have fallen after the rail broke."

The court did not err in refusing the above prayer, for the reason that the appellee alleged, and there was testimony tending to prove, that the injury was the result of two concurrent proximate causes; that is, a defective rail and bridge.  The case of *St. Louis & San Francisco R. R. Co.* v. *Hill,* 79 Ark. 76, relied on by the learned coun-

sel for the appellant is not applicable, for the reason that there the evidence tended to show that the sole and independent proximate cause of the injury was the derailment of the train, and that there was no negligence in the construction or maintenance of the bridge which collapsed only after the derailed train ran upon it.

(6) Appellant's prayer No. 11 is as follows: "The fact that longitudinal braces were put on this bridge in rebuilding or repairing it can not be considered by you as evidence of its defective condition before, whatever may be your opinion as to the reason why they were put on—that is to say, the only question which you can now consider is whether or not the defendant was in the exercise of ordinary care in maintaining the bridge as it was at the time of the injury."

One witness for the appellee testified that "he did not think the bridge would have fallen if there had been enough braces from one bent to another." He was shown a photograph taken after the accident, and after the bridge had been repaired. This photograph showed that the braces were lengthwise from bent to bent. The witness testified, without objection on the part of appellant, that the photograph showed "the way a railroad bridge of this kind should be constructed."

The appellant contends that, in the absence of the above instruction, the jury might have inferred that, because these braces were put on the bridge subsequent to the accident, and while the same was being repaired or rebuilt, the appellant was negligent in not using such braces in the original construction of the bridge. But the testimony of all the witnesses concerning this, on behalf of the appellant, showed that the longitudinal braces were used not because they were thought to be necessary in the permanent construction of the bridge in order to make it safe, but they were simply used as a temporary expedient while the bridge was undergoing repairs or rebuilding. This testimony on the part of appellant was not controverted by the appellee. This court has often ruled that it is reversible error to permit testimony to the effect that

after the accident happened, there was a change in the appliance or in the manner of construction and operation of the structure or appliance causing the injury. *Pekin Stave Co.* v. *Ramey,* 108 Ark. 483, and cases cited. Under the above rule, testimony can never be held prejudicial where it merely shows that the change made after the accident happened was only during the temporary repair or reconstruction of the structure or appliance, and that there was no permanent alteration in the manner of construction or use of the appliance or structure. The *rationale* of the rule is that the master in making the change, does not thereby admit that the use or construction of the appliance or structure at the time the injury occurred was negligent. Since the uncontradicted proof shows that the longitudinal braces were used, not because the master deemed same necessary for the proper permanent construction of the bridge, but were only used for the purpose of repairing or rebuilding the bridge, there could not be any inference of negligence because the longitudinal braces were not in use when the accident happened, and, therefore, no prejudice could have resulted from such testimony and from the refusal of the court to grant appellant's eleventh prayer.

(7)     The latter paragraph of the prayer was also erroneous, because it told the jury that the only question they could consider was whether or not the defendant was in the exercise of ordinary care in maintaining the bridge. This ignored the issue as to the defective rail which appellee alleged was a concurrent proximate cause of his injury.

The court did not err in refusing to tell the jury that they "should not consider the size of the rails as evidence of negligence on the part of the defendant." The evidence as to the size of the rails was developed incidentally on cross-examination of witnesses for appellant who, on the direct examination, had testified in regard to the broken rail. The rail, its size, weight and strength, were all relevant to the issues, and it was proper to inquire concerning same. And especially was it not prejudicial

error to elicit such facts after appellant's witness had testified on the direct examination as to the "size and condition of the rails on that bridge." Such facts were developed by the appellant, itself, on the direct examination and the appellee had the right to cross-examine on the same line that the appellant had pursued in its direct examination.

In its sixteenth prayer, appellant sought to have the court tell the jury that "unless the breaking of the rail was due to the fault and carelessness of the defendant in failing to discover defects which caused it to break," it was one of the hazards which the appellee assumed. The court did not err in refusing this prayer, for the reason already shown in connection with the discussion of other instructions, that it limited the inquiry to the defective rail as the sole proximate cause of the injury, and ignored the alleged defective condition of the bridge as a concurrent proximate cause of appellant's injury. Moreover, the court fully and correctly defined the issue of assumed risk and declared the law applicable thereto in its instruction No. 6.*

Appellant contends that the court erred in refusing to tell the jury, in the latter clause of instruction No. 17, that "insofar as the opinion of the doctors in this case is formed from a history of the case as given them by the plaintiff, you should not allow it to influence your own judgment in considering the facts as given you by the plaintiff himself."†

---

*6.   When a man enters the service of another, he is deemed in law to have assumed all the risks of injury which are ordinarily incident to the employment in which he is engaged; and if he is injured by an accident which is ordinarily incident, and liable to occur in such service, then the master is not liable. But such servant does not assume the risk of any injury which may occur from the negligence of the master or of his fellow servants (Reporter).

†17. You are instructed that so-called expert or opinion testimony is permissible under the rules of law, but is of the lowest and most uncertain and unsatisfactory character, and should be received and considered by the jury with the highest degree of caution. It is your duty to carefully consider their statements as to the method and means of obtaining the information on which they arrive at their opinion, and you should only give credence to their opinion, if you consider it at

Even if this clause, considered as a separate proposition of law, would have been correct, it was but the concluding portion of a long and argumentative instruction on the weight of the evidence which the court very properly refused.

(8) The appellant contends that the evidence is not sufficient to sustain the verdict. The testimony on behalf of appellee, which we have set out, when given its strongest probative force in his favor was sufficient to warrant the jury in finding that the appellant was negligent in that it failed to exercise ordinary care to maintain its track and bridge in a safe condition, which resulted in the injury of which appellee complains. The evidence likewise was sufficient to sustain the verdict as to the amount of damages. The verdict was not excessive. See *St. Louis, I. M. & S. Ry. Co.* v. *Webster,* 99 Ark. 265-81.

(9) The contention that the act of Congress of April 22, 1908, is applicable here, was not raised in the trial court, and for that reason will not be considered for the first time on this appeal. Neither the pleadings nor the evidence raised this question. Although the complaint does not state facts sufficient to make the Federal Employers' Liability Act applicable, we would treat same as applicable if the evidence showed that appellee at the time of his injury was engaged in interstate commerce. See *Toledo, etc., Ry. Co.* v. *Slavin,* 236 U. S. Rep. 457. But here the allegations of the complaint and the evidence are only to the effect that appellee was running the train loaded with gravel and ballast from Arkansas City to Halley. These are stations a few miles apart on appellant's branch line in Arkansas.

---

all, in proportion to the thoroughness or uncertainty of the information on which they base it. You are further instructed that you are not bound by their opinions at all, further than it may coincide with your own judgment of the matters about which they give opinion, and that it would be your duty to reject all such testimony as does not agree with your own judgment, or as may appear to you not to have been formed from correct information of the best character obtainable. You are further instructed that insofar as the opinion of the doctors in this case is formed from a history of the case as given them by plaintiff, you should not allow it to influence your own judgment in considering the facts as given you by the plaintiff himself (Reporter).

(10)   After the adjournment of the August term of the court at which the trial was had and the judgment entered, appellant, on the 4th day of December filed its motion to vacate the judgment and grant a new trial, in which it set up that since the trial of the cause: "Defendant has learned that at the time of the trial the plaintiff and his attorneys had in their possession x-ray pictures of plaintiff, taken by Doctor McGill, showing that plaintiff had not been injured as he claimed to be, and that he had been advised by Doctor McGill that he had suffered no permanent injury," etc.; that the plaintiff positively refused to permit defendant to take x-ray pictures of his person, and that while it had heard that x-ray pictures had been made of the plaintiff, it also understood that they were to have been introduced as evidence in the case, and it expected to have the opportunity of examining them in the case, and that the plaintiff and his attorneys "failed and refused to introduce them in evidence," etc. The appellee, in response to the motion, denied these allegations, and set up that Dr. W. F. Smith knew of the x-ray pictures taken by Doctor McGill, as shown by his testimony at the trial. He further set up that Doctor McGill made x-ray plates for plaintiff's own use, but that after appellee received the x-ray pictures, they were so dim he could tell nothing about them; that had the defendant so desired, it could have made plaintiff a witness, and introduced those plates or pictures in evidence, etc.

Evidence was heard on behalf of the appellant and appellee on the trial of this motion, and the court overruled the same, and an appeal has been lodged from such final order. It is sufficient to say, in regard to this appeal from the court's order, overruling appellant's motion and refusing to vacate the judgment, that the court did not abuse its discretion. The facts developed on the hearing of the motion were sufficient to justify the court in its ruling.

At the original trial, Dr. W. F. Smith, the chief surgeon for appellant, was a witness, and he testified fully in regard to these x-ray pictures and as to what they

showed. His testimony discloses that he saw the pictures on the second day of June, the day after they were taken, that the plaintiff brought them to him in person, and told him that Doctor McGill had taken them. One of the attorneys for the appellant, who conducted the trial, states that he found that "there was a reference to the x-ray pictures taken by Doctor McGill in the investigation, but that it entirely escaped his knowledge until after the trial, and that he understood at the time that the x-ray pictures which had been taken had been taken by either Doctor Marshall or Doctor Austin.

The above facts alone were sufficient to warrant the court in overruling appellant's motion and entering an order refusing to vacate the judgment, for these facts show appellant did not exercise proper diligence. They show that appellant had discovered, before the trial or by proper care could have discovered the existence of the x-ray pictures, and that by the exercise of reasonable diligence, it could have developed at the trial all that it now claims as newly discovered evidence. The testimony of the appellee on the motion to vacate tended to support the allegations of his response, and it was a matter resting largely within the discretion of the court, and the court, as above stated, did not abuse its discretion, but was fully warranted in its finding.

There is no reversible error in the record, and the judgment must, therefore, be affirmed.