11834

CATO v. GRENDEL COTTON MILLS

(129 S. E., 203)

1. MASTER AND SERVANT—STATUTE REQUIRING PAYMENT OF WAGES ON DISCHARGE PART OF CONTRACT.—Civ. Code 1922, § 5592, declaring that, on discharge of laborers, wages earned shall be immediately due and payable, and providing penalty for failure to pay within 24 hours after written demand, *held* part of contract between cotton mill and laborer.

2. MASTER AND SERVANT—STATUTORY RIGHT TO PAYMENT OF WAGES ON DISCHARGE CANNOT BE WAIVED.—A laborer's right to immediate payment of wages on discharge, under Civ. Code 1922, § 5592, cannot be waived or relinquished by contract.

Before TILLMAN, J., Greenwood, March, 1924. Affirmed.

Action by J. M. Cato against the Grendel Cotton Mills. Judgment for plaintiff and defendant appeals.

*Messrs. Grier Park & McDonald,* for appellant, cite: *Action brought under:* Civ. Code, 1922, Sec. 5592. *Purpose of statute:* 96 S. C., 4. *Servant occupying premises becomes trespasser:* 16 R. C. L., 582.

*Mr. T. I. Williamson,* for respondent.

September 10, 1925.

The opinion of the Court was delivered by MR. ACTING ASSOCIATE JUSTICE J. W. JOHNSON.

This action was brought under Section 5592 of Volume 3, Code 1922, for the recovery of wages alleged to be due plaintiff by defendant, and for the statutory penalty for failure of defendant to pay the same after due demand in writing. The case was tried before a magistrate, who gave judgment for plaintiff for the full amount claimed, less $18 accrued rent. An appeal was taken from this judgment to the County Court for Greenwood County, and resulted in an order of his Honor, H. C. Tillman, dismissing the appeal, and affirming the judgment of the magistrate. From this judgment defendant appeals to this Court, and alleges error on the part of the County Judge by two exceptions:

(1) That his Honor erred in holding that the defendant was liable for the penalty under the statute; the error being that plaintiff being in possession of the defendant's house as a part of his compensation, defendant had the right to demand the surrender of possession of same as a condition precedent to the payment of wages.

(2) That his Honor erred in holding that plaintiff's wages were due, within the meaning of the statute, so as to make defendant liable for the penalty for its failure to pay such wages within 24 hours after written demand, notwithstanding that under plaintiff's contract of employment he enjoyed the possession of defendant's house as a part of his compensation; the error being that under such contract, and by virtue of the well-understood custom, defendant was entitled to the surrender of possession of the house, and plaintiff's wages did not become due until such possession was surrendered.

The record shows that on August 13, 1923, plaintiff, Cato, was in the employ of defendant, Grendel Cotton Mills; that on that day he was discharged by defendant; that defendant

30—S. C. R.—132.

then owed plaintiff $19.12; that on September 1, 1923, Cato made written demand on defendant for his wages; that defendant refused to pay until Cato should vacate the house of defendant then occpied by Cato, defendant alleging that by a custom of the mill a discharged employee is not entitled to his pay until he vacates the house of the company occupied by him.

The section of the Code mentioned *supra* is as follows:

"When any corporation carrying on any business in this State in which laborers are employed, whose wages, under the business rule or custom of such corporation, are paid monthly or weekly on a fixed day beyond the end of the month or week in which the labor is performed, shall discharge any such laborer, the wages which have been earned by such discharged laborer shall become immediately due and payable. And if not so paid within twenty-four hours after written demand therefor, then such laborer shall recover in addition thereto a penalty of as much per day for the time said wages shall remain unpaid, not exceeding thirty days, as he was receiving at the time of his discharge."

When the defendant hired Cato, the statute just quoted formed a part of the contract. It wrote the condition that in the event of defendant's discharge his wages became immediately due and payable. But defendant says that plaintiff agreed to waive his statutory rights by accepting employment subject to the condition that his wages should not become due and payable until he vacated plaintiff's house. The evidence adduced to prove this allegation is the statement of the magistrate, in his return, that "this practice is a well-understood and universal custom or usage with this defendant." If it be conceded that the magistrate's finding of fact as to the custom of this defendant was equivalent to a finding that plaintiff, Cato, knew of the custom, and acquiesced in and was bound by it, then his conclusion of law must rest upon the proposition that Cato could not legally waive his right to immediate payment of

his wages, or could not, by contract, add to the statute something the Legislature did not see fit to write into it.

The question then arises: Was Cato's right upon discharge to immediate payment of his wages a right he could either expressly or impliedly waive or contract away? The statute the Court is called upon to construe was passed, no doubt, to meet an evil prevalent at the time of its passage. We have corporations in this State employing thousands of laborers. Most of these laborers are employed in the cotton mills. Defendant's counsel say in their printed argument, in substance, that most of these employees are impecunious. I think this is true. Some of these corporations employed their help either by the week or month, and if the employee was discharged before his wages became due he had to wait until "pay day" before he could get his wages. It is easy to picture the consequences to the impecunious laborer of this mode of settlement. To remedy the hardships that, no doubt, followed this practice by corporations, the statute in question was enacted.

To recur to the question hereinbefore propounded: Was Cato's right, upon discharge, to immediate payment of his wages, a right he could either expressly or implidely waive or contract away? We answer, No; that, in the light of the reason for the enactment of the statute, it would be against public policy to allow him to do so. The following authorities bear upon the question at issue:

"The public policy of the government is to be found in its statutes, and, when they have not directly spoken, then in the decisions of the Courts and the constant practice of the government officials; but, when the lawmaking power speaks upon a particular subject, over which it has constitutional power to legislate, public policy in such a case is what the statute enacts." *United States v. Trans-Missouri Freight Ass'n,* 166 U. S., 290; 17 S. Ct., 540; 41 L. Ed., 1007.

"Courts must refuse to sustain that which is against the public policy of the State, when such public policy is mani-

fested by the legislative or fundamental law of the State."
*People ex rel. Peabody v. Chicago Gas Trust Co.,* 130 Ill.,
268; 22 N. E., 798; 8 L. R. A., 497; 17 Am. St. Rep., 319.

"Contracts contravening the established policy of the
State cannot be enforced in the Courts thereof." *Common-
wealth Mut. Fire Ins. Co. v. Hayden,* 60 Neb., 636; 83 N.
W., 922; 83 Am. St. Rep., 545.

"Parties are permitted, by contract, to make a law for
themselves only in cases where their agreements do not vio-
late the express provisions of any law, nor injuriously affect
the interests of the public." *Little Rock & Ft. S. Ry. Co.
v. Eubanks,* 48 Ark., 460; 3 S. W., 808; 3 Am. St. Rep.,
248.

"And it is for the welfare of society that their employers
shall not be permitted, under the guise of enforcing contract
rights, to abdicate their duties to them. The consequence
would be that every railroad company, and every owner of
a factory, mill, or mine, would make it a condition precedent
to the employment of labor, that the laborer should release
all right of action for injuries sustained in the course of the
service, whether by the employer's negligence or otherwise."
Id., 249.

"The Courts of no State will hold valid any contract that
is injurious to the public rights of its people, offends their
morals, contravenes their policy, or violates a public law."
87 Am. St. Rep., 737.

"An agreement which discloses an intention to contravene
a statute is vicious and unenforceable." Id.

A railroad company "cannot make a valid contract where-
by it will be exempt from liability for negligence." *Wal-
lingford v. Columbia & G. R. Co.,* 26 S. C., 258; 2 S. E.,
19. *Johnson v. Charleston & S. F. Ry. Co.,* 55 S. C., 152;
32 S. E., 2; 33 S. E., 174; 44 L. R. A., 645. *Reed v.
Southern Ry.,* 75 S. C., 170; 55 S. E., 218. *Kirkland v.
Charleston & W. C. Ry.,* 79 S. C., 276; 60 S. E., 668; 128
Am. St. Rep., 848.

Our present Chief Justice delivered the opinions in the *Reed* and *Kirkland Cases,* and he bases his decisions on the doctrine of public policy. In *Magwood v. Duggan,* 1 Hill, Law, 182, we find this:

"It is a universal rule that contracts, which have for their object anything which is repugnant to justice, or against the general policy of the common law, or contrary to the provisions of a statute, are void."

The case of *McConnell v. Kitchens,* 20 S. C., 430; 47 Am. Rep., 845, was an action on a contract. The consideration of the contract was the purchase price of fertilizers. In discussing the law applicable to the facts of this case, Mr. Justice (afterwards Chief Justice) McIver said:

"Now, while it is true that the Legislature has not, in so many words, declared that it shall not be lawful to sell any commercial fertilizer in this State, unless the regulations above prescribed have been complied with, or that a contract for the sale of such fertilizer, without complying with such regulations, shall be illegal and void, yet it seems to us manifest that the real object of the legislation set out above was to prohibit the sale of commercial fertilizers unless the prescribed regulations are complied with, in order to protect the farming interest from deceit or imposition in the sale of an article which has come to be so extensively, if not universally, used by the farmers of the country, as commercial fertilizers."

Continuing, he says:

"In 2 Benj. Sales, § 825, the writer, after commenting at length upon the cases, deduces the following rules therefrom: 'First. That where a contract is prohibited by statute it is immaterial to inquire whether the statute was passed for revenue purposes only or for any other object. It is enough that parliament has prohibited it, and it is therefore void. Secondly. That where the question is whether a contract has been prohibited by statute, it is material in construing the statute to ascertain whether the

Legislature had in view solely the security and collection of the revenue, or had in view, in whole or in part, the protection of the public from fraud in contracts or the promotion of some object of public policy.' "

The Court held in this case that, where a party sold prepared agricultural lime in this State without a tag stating the chemical composition of such fertilizer and the date of analysis, as required by law, and took a note for the purchase price, that the contract was illegal and void. This case is not exactly on all fours with the case we are considering, as the statute in this case provided a penalty for its violation. However, I think the reasoning employed by that eminent jurist, Chief Justice McIver, applicable to the facts of the case we are considering.

This statute has been before this Court for construction in several cases. *Wynne v. Seaboard Air Line Ry.*, 96 S. C., 1; 79 S. E., 521, Ann. Cas., 1916B, 133. *Champion v. Hermitage Cotton Mills*, 98 S. C., 418; 82 S. E., 672. *Trammell v. Victor Mfg. Co.*, 102 S. C., 483; 86 S. E., 1057. *Burden v. Woodside Cotton Mills*, 104 S. C., 435; 89 S. E., 474. In the *Trammell Case* the Court says:

"We should not overlook the fact that the statute is remedial as well as penal. In so far as it is remedial, it should be construed liberally, to suppress the mischief it was designed to remedy. And, while it is true that, in so far as it is penal, it should be strictly construed to prevent injustice or oppression, the rule of strict construction does not require a narrow, verbal or unreasonably technical construction, such as would defeat the clear intention of the lawmakers"—citing *Mills v. Southern Ry.*, 82 S. C., 242; 64 S. E., 238. *Brown v. Atlantic Coast Line R. Co.,* 91 S. C., 377; 74 S. E., 754.

At the time of the passage of this act corporations discharged their impecunious employees, no doubt, in many cases, with large families, who had nowhere to go and no means with which to defray their expenses while seeking

other employment. They were, under the custom mentiond, compelled to wait until pay day.for their wages. In the meantime expenses were mounting, and the situation of the laborer became more precarious each day. The statute in question was passed to remedy this state of affairs. Now, if the object of the statute can be thwarted by custom or contract, then the statute might as well be repealed, because it will not be long before the owner of every factory, mill, or other corporation employing labor, subject to the provisions of the statute, will establish customs and enter into contracts that will completely nullify the statute.

The views herein expressed do not in any way conflict with the decision of this Court in the *Wynne Case.* I do not contend that a corporation should be penalized "for failure to pay what is not a just debt; nor for the failure to pay, when the discharged laborer, after demanding payment, prevents compliance with the demand by his own conduct; nor to deny or preclude the right of the corporation to interpose any valid counterclaim or defense to the claim of such laborer;" but I hold that when a laborer is discharged, and the corporation at that time owes him money, and there is no valid defense to his claim, the corporation cannot interpose as a defense to such claim a custom of, or even a contract with, the corporation whereby the laborer must vacate his house before he will be entitled to his pay. Such a condition would contravene the plain intention of the statute, and, as I have said, be against public policy.

A majority of the Court concurring in this opinion, the judgment of this Court is that the exceptions be overruled, and the judgment of the County Judge affirmed.

MR. CHIEF JUSTICE GARY and MR. JUSTICE MARION concur.

MR. JUSTICE WATTS dissents.

MR. JUSTICE COTHRAN did not participate.

MR. JUSTICE MARION.: I concur in the opinion of Mr. Acting Associate Justice Johnson, but desire to state the

reasons for my conclusion from a slightly different viewpoint.

In the last analysis, appellant's position is this: By virtue of a custom not to pay discharged employees until they vacate the houses furnished them, Cato impliedly contracted that in the event of his discharge his earned wages should become due and payable, not immediately upon his discharge, as the statute (Section 5592, Vol. 3, Code 1922) requires, but upon or after the vacation of the house furnished him by the Mills as a part of the contract of hiring. It is not disputed that at the time of his discharge the Mills owed Cato a certain sum of money as wages, and that up to the time of such discharge the Mills also owed him the use of the house. At the termination of the contract of employment by Cato's discharge, the obligation of the Mills, imposed in express terms by the statute, was to pay Cato's earned wages immediately, and the obligation of Cato was immediately to vacate the Mills' house. In the absence of a contractual stipulation to that effect, it is entirely clear that, in the face of the express mandate of the statute, the Mills could not postpone the performance of the statutory duty imposed to pay the earned wages until after the discharged employee had performed his obligation to vacate the house.

In that situation, certainly, the Mills would have had no more right to say to Cato, "Perform your obligation to vacate the house, and then we will perform our obligation to pay your earned wages," than Cato would have had to say to the Mills, "You discharge your duty to pay my wages, and then I will discharge my obligation to vacate your house." That the effect of the statute was to make the performance by the employer of the payment of the earned wages an act prior in point of time to the fulfillment of the employee's reciprocal obligation to vacate the house would not seem open to serious question. The language of the statute is that "the wages which have been earned by such

discharged laborer shall become immediately due and payable." The duty imposed upon the corporation to pay immediately upon the discharge, regardless of any reciprocal duty of the employee to vacate the employer's premises or to perform any other act of like nature, is absolute. If, therefore, the Mills in this case had a right to make the wages due Cato payable upon or after his vacation of the house, instead of payable immediately upon or after his discharge, as the statute expressly requires, such right must rest upon the theory that the corporation may lawfully contract so to limit the performance of the absolute duty mandatorily imposed by the statute.

Conceding the very doubtful proposition that the record in this case is sufficient to support a finding of fact that Cato agreed with the Mills that his wages in the event of his discharge should not become due and payable until he vacated the Mills' house, I am clearly of the opinion that the Mills could not, by such contractional stipulation with its employe, relieve itself of the absolute duty imposed by the statute to pay the laborer's earned wages immediately upon his discharge. It is an elementary and fundamental principle of law that no person can by contract relieve himself of a duty which he owes to the public independently of the contract. And even under the view that a master may under some circumstances contract against the performance of duties which attach as a matter of law to the contractual relation of master and servant, it is well settled that the master cannot so contract, where the interest of the public requires the performance of a particular duty, or where, because the parties do not stand on an equal footing, the weaker party is compelled to submit to the stipulation in question. 6 R. C. L., 727, § 132. *Johnston v. Fargo,* 184 N. Y., 379; 77 N. E., 388; 7 L. R. A. (N. S.), 537; 6 Ann. Cas., 1. *Osgood v. Central Vermont R. Co.,* 77 Vt., 334; 60 A., 137; 70 L. R. A., 930. *Hartford Fire Ins. Co. v. Chicago, M. & St. P. R. Co.,* 70 F., 201; 17 C. C. A., 62; 30 L. R. A., 193.

It is true that the foregoing authorities apply the proposition announced above to contractual exemption from liability for negligence generally, and to the cases cited may be added decisions of our own Court to the same effect, such as *Wallingford v. Columbia & G. R. Co.,* 26 S. C., 258; 2 S. E., 19. *Johnson v. Charleston & S. Ry. Co.,* 55 S. C., 152; 32 S. E., 2; 33 S. E., 174; 44 L. R. A., 645. *Reed v. Southern Ry.,* 75 S. C., 170; 55 S. E., 218, and *Kirkland v. Charleston & W. C. Ry.,* 79 S. C., 276; 60 S. E., 668, 128 Am. St. Rep., 848. But between the legal duty of an employer to furnish a safe place to work, for example, and the duty here imposed by statute upon corporate employers to pay discharged laborers their earned wages immediately, there is, in the aspect of the matter having to do with the public's interest in the performance of the two duties, no sound basis for a distinction. The very validity of the statute here in question depends upon the soundness of the view that it is a public measure, enacted in the interest of the public welfare. *Wynne v. Seaboard Air Line Ry.,* 96 S. C., 1; 79 S. E., 521, Ann. Cas., 1916B, 133. *Champion v. Hermitage Cotton Mills,* 98 S. C., 418; 82 S. E., 672. *Trammell v. Victor Mfg. Co.,* 102 S. C., 483; 86 S. E., 1057. *Burden v. Woodside Cotton Mills,* 104 S. C., 435; 89 S. E., 474. If so, the duty imposed upon corporate employers by this statute is one charged with a public interest, which is independent of the interests of the individual parties to the contract of employment, and cannot be made the subject of contractual barter and sale between the corporate employer and the laborer.

Indeed, the nature of the public interest in the duty imposed upon corporate employers by the statute is well illustrated by the case at bar. No more reasonable ground can be assigned for the enactment of this law than the implied legislative finding of fact that the members of the class of laborers affected are dependent upon their earned wages, not only for a livelihood, but for the means absolutely es-

sential to enable them, when discharged, to vacate, move their families and household effects, and find employment elsewhere. If Cato had no money with which to move his family and effects elsewhere, the refusal of the Mills to pay his wages practically hog-tied him on the Mills' premises, with the result that, deprived of employment and without means to move, he became automatically liable to the Mills for the rent of his house, which liability in a short time time would eat up the small balance of earned wages due him and leave him a financial derelict—a potential menace to, or a public charge upon, society.

Without enlarging here upon the rationale of the law as a matter of public policy, it is sufficient for present purposes to repeat that the duty imposed by this statute upon corporate employers is a public duty in the discharge of which the public has an interest which is independent of the interests of the individual parties to the particular contract of employment in question, and that against the performance of such public duty the contractual stipulation here relied on, under the fundamental principle that private citizens may not by contract abrogate the interest of the public in the discharge of duties imposed by statute, was utterly ineffectual to relieve the Mills of the duty to pay Cato's earned wages immediately upon or after his discharge.

If, after the payment of his wages, Cato had proved recalcitrant in the matter of promptly vacating the Mills' house, the corporation would have had the same remedy that any other employer or landowner in this State has to eject one in unlawful possession of another's premises. If that remedy be ineffectual or inadequate, corrective measures are for the lawmaking power, and not for this Court.