**FLEMING, Administrator of Wage and Hour Division, United States Department of Labor, v. CARLETON SCREW PRODUCTS CO.**

No. 249.

District Court, D. Minnesota, Fourth Division.

March 13, 1941.

Gerard D. Reilly, Irving J. Levy, and Roy C. Frank, all of Washington, D. C., and Donald M. Murtha, of Minneapolis, Minn., for plaintiff.

Samuel J. Levy and Jerome A. Levinson, both of Minneapolis, Minn., for defendant.

JOYCE, District Judge.

The plaintiff in this action seeks to enjoin the defendant from violating the provisions of Sections 15(a) (1), 15(a) (2) and 15(a) (5) of the Fair Labor Standards Act of 1938, Title 29 U.S.C.A. § 201 et seq.

The complaint charges that since October 24, 1938, the date upon which the act became effective, the defendant has continuously violated it in the following respects: (1) it has not paid its employees who were engaged in the production of goods for commerce, or in any process or occupation necessary for the production of such goods, the overtime compensation provided for by Section 7 of the Act; (2) it has sold, shipped, delivered, transported and offered for transportation in interstate commerce, goods produced in violation of Section 7 of the Act; (3) it has failed to make, keep and preserve the records provided for by certain regulations promulgated by plaintiff pursuant to the authority granted him by Section 11(c)

of the Act; and by virtue of its continuous violations of said act the defendant has obtained an unfair competitive advantage over its competitors.

The answer of the defendant denies the allegations of the complaint tending to show any violation of the act on defendant's part and specifically alleges a full compliance by it with all of the legal requirements of the act. The answer further asserts that commencing September 1, 1938, more than a month and a half prior to the effective date of the act, the defendant and its employees entered into agreements setting up a regular rate of pay and that ever since said date defendant has paid to its employees the regular rate of pay for all hours not in excess of the maximums prescribed by the act, and for all such excess hours the defendant has paid to its employees one and one-half times the agreed regular rate of pay at which such employee was employed. While in its answer defendant denied being engaged in the production of goods for commerce, or that its employees were so engaged, or in processes or occupations necessary to the production thereof, at the trial it admitted plaintiff's allegations with respect to such matters, and the factual issue of commerce is not now involved.

The answer further challenges the constitutionality of the Fair Labor Standards Act of 1938 upon various grounds. That issue is also no longer involved as the constitutionality of the act has been upheld by the United States Supreme Court in the cases of United States v. F. W. Darby Lumber Co., 61 S.Ct. 451, 85 L.Ed. ——, and Opp Cotton Mills, Inc. v. Administrator, 61 S.Ct. 524, 85 L.Ed. ——, both decided February 3, 1941.

The Fair Labor Standards Act of 1938 was enacted by Congress on June 25th of that year, but did not become effective until October 24, 1938. Its purpose is set forth in the finding and declaration of policy contained in Section 2, as follows:

"Sec. 2 [§ 202]. (a) The Congress hereby finds that the existence, in industries engaged in commerce or in the production of goods for commerce, of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers (1) causes commerce and the channels and instrumentalities of commerce to be used to spread and perpetuate such labor conditions among the workers of the several States; (2) burdens commerce and the free flow of goods in commerce; (3) constitutes an unfair method of competition in commerce; (4) leads to labor disputes burdening and obstructing commerce and the free flow of goods in commerce; and (5) interferes with the orderly and fair marketing of goods in commerce.

"(b) It is hereby declared to be the policy of this Act [chapter], through the exercise by Congress of its power to regulate commerce among the several States, to correct and as rapidly as practicable to eliminate the conditions above referred to in such industries without substantially curtailing employment or earning power."

The only sections of the act involved in the within case are Sections 7, 11(c) and 15(a) (1), (2) and (5).

By Section 7 there is fixed an hours standard which provides that for the first year after the effective date of the act no employer shall employ anyone in the production of goods for commerce for a work week longer than 44 hours, unless such employee receives compensation for hours worked in excess of 44 at a rate not less than one and one-half times the regular rate at which such employee is employed. During the second year following the effective date of the act the regular work week was reduced to 42 hours and thereafter to 40 hours. This section provides for certain exemptions in the overtime provisions which have no application in this proceeding.

Section 11(c) requires the keeping of such records as to wages, hours and other conditions of employment as the Administrator of the Wage and Hour Division by regulation shall prescribe.

Section 15 contains operative provisions. 15(a) (1) makes it a violation of the act to transport any goods in commerce in the production of which any employee was employed in violation of Section 7. 15(a) (2) makes it an offense to violate any of the provisions of Section 7, or any of the provisions of any regulation or order of the Administrator issued under Section 14. 15(a) (5) makes it an offense to violate any of the provisions of Section 11(c).

By Section 17 jurisdiction is conferred on this court.

It is to be observed that Sections 7 and 15(a) (1) and (2) are self-executing in

character and do not depend upon administrative determination.

The defendant is a corporation with its headquarters and plant located in the City of Minneapolis, Minnesota, where it manufactures, sells and distributes screws, brass sleeves, bushings, roller bearings and similar screw machine products. Twenty-four per cent of all products manufactured by the defendant are sold outside the State of Minnesota in general competition with the industry. Defendant employs on the average some eighteen employees, who when the Fair Labor Standards Act of 1938 was enacted were working regular work weeks of 50 to 56 hours at rates of pay ranging from 45 cents to 80 cents an hour. In the late summer of 1938 following the passage of the law, officers of the defendant discussed the wage and hour situation with members of a committee of the shop. It was indicated to the men that the earnings of the company were low and that a wage adjustment of some kind would have to be made in view of the approaching effective date of the Fair Labor Standards Act. The employees were told that if time and one-half had to be paid on the then going rates of pay for hours in excess of 44 per work week, it would be necessary to run a straight 44-hour week at the then existing wage rates. It was, however, the desire on the part of the employer to maintain the existing weekly earnings without any reduction, and to achieve that end a plan was submitted by the officers of the defendant to the committee, which, in short, provided that the employees were to sign employment agreements which would set forth agreed hourly rates of pay which would be in all cases 10 cents less than they were then being paid. Time and one-half based on the reduced rate would be paid for all overtime work done in excess of 44 hours, and if the total pay thus computed did not amount to as much as the employee would have received for the same number of hours worked at his previous hourly rate, the company would "add as a bonus or gratuity" at the end of each week such additional sum as might be necessary to guarantee to the employee the same weekly earnings he had theretofore received at his straight time hourly rate. The committee was requested to submit this plan to the employees. The reaction of the latter to the plan was hostile. Certain of them were not satisfied as to its legality and hesitated to agree to its terms for fear of violating the law.

At a general meeting of all employees later called by the defendant, after stating the company had suffered a business loss during the first six months of 1938, and again explaining the workings of the aforesaid plan, it was made plain to the men that if the plan was not agreed to it would be dropped and the defendant would be forced to reduce the then working time of 50 to 56 hours to a straight time work week consisting of 44 hours, at the rates of pay then in effect. This was not agreeable to the men, who wanted of course to maintain at least the existing scale of pay and were willing if necessary to work longer hours as had theretofore been the practice to so maintain it. No agreement was reached at that meeting as the men were still fearful as to the legality of the plan, and a further meeting was held with the employees a week or so later, at which time they agreed to accept the proposed plan and signed the employment agreements submitted by the company.

It is clear that the purpose of the plan, which was put into effect on September 1, 1938, was to keep within the provisions of the new wage and hour law and at the same time to maintain the employees' wages at the same level as theretofore existed. In general the plan works out in this way: If an employee had been receiving 60 cents an hour previous to September 1, 1938, a rate of 50 cents was set up on defendant's books and on that rate overtime compensation is computed. To this amount is added a "bonus" in an amount sufficient to bring the employee's total wage for the pay period to an amount equalling the total hours worked during such pay period multiplied by 60 cents—the hourly rate he received prior to September 1, 1938. Thus (using a 44 hour basic week), if this man works 50 hours a week his pay is computed by multiplying 44 (hours) by 50 cents (the rate set up on the books), which equals $22; multiplying 6 (overtime hours) by 75 cents (time and one-half) equals $4.50, which added to the $22 makes a total of $26.50. At straight time of 60 cents per hour he would have received for 50 hours $30. And so in order to bring his pay up to this figure an amount of $3.50, called a bonus, is added to the $26.50 and the man receives a check for $30. In cases where this same employee works only 44 hours a week there is of course no over-

time to compute but the bonus is added in the same manner as in the other case. So that so far as the employee was concerned there was no difference in the way he computed his earnings before and after September 1, 1938. To quote the testimony of one of the men, "I always computed weekly earnings on basis of total number of hours times the old rate". There was nothing on the check or otherwise showing how much the bonus was. The witness Kretlow testified: "we really did not get a cut; it was only on the books that we got the cut."

A somewhat different situation exists with respect to employees who entered defendant's employ after September 1, 1938, but in principle the procedure is the same, the employee signing an agreement based on an "agreed" hourly rate and receiving a "guaranteed" earning based on a different rate.

Defendant contends that the agreed regular rates of pay stipulated in the individual employment agreements with its employees are equivalent to the regular rate referred to in Section 7 of the Act. It asserts that it had a perfect legal right to so contract with its employees as to avoid an increased labor cost; that it did not evade its legal liability under the act and that it had a right to put into effect such plan as would protect its employees in weekly earnings and protect itself against the approaching possibility of increased cost of production as long as it did not evade the requirements of paying for overtime on the basis of one and one-half times an established regular rate of pay.

Plaintiff contends that the rates set forth in such agreements are fictitious and that the real regular rates of pay being paid the employees who were in defendant's employ on September 1, 1938, are the hourly rates received by such employees previous to the signing of such employment agreements; that there was no reduction in rate of pay of defendant's employees, the agreements constituting subterfuges resorted to in an attempt to circumvent the act, and that defendant has consequently failed to pay overtime in accordance with the requirements of Section 7.

■ It seems to me that the construction contended for by defendant to the effect that employer and employee may agree on a regular rate of pay regardless of what compensation the employee actually receives, will permit employers to avoid the obligations imposed by Section 7 and will completely nullify the overtime provisions therein contained. If an employer is permitted to establish an "agreed" rate of pay 10 cents below that which it in fact is, as plaintiff points out in his brief there is no reason why the regular rate could not be "stipulated" for purposes of overtime compensation at 20 or 30 cents below what it actually is and remove the penalty of Section 7 entirely. The fact that employer and employee "agree" to a rate of pay which does not represent that at which the employee is really employed cannot preclude the operation of Section 7, for private agreements which are inconsistent with wage and hour statutes must yield to the broader public policy declared in those acts. See City of Glendale v. Coquat, 46 Ariz. 478, 52 P.2d 1178, 102 A.L.R. 837; Cato v. Grendel Cotton Mills, 132 S.C. 454, 129 S.E. 203, 41 A.L.R. 439; Larsen v. Rice, 100 Wash. 642, 171 P. 1037; Goebel v. Elliott, 178 Wash. 444, 35 P.2d 44; Short v. Bullion-Beck & Champion Mining Co., 20 Utah 20, 57 P. 720, 45 L.R.A. 603; and Montgomery Ward & Co. v. Lusk, Tex.Civ.App. 52 S.W.2d 1110.

■ Moreover, the evidence in this case clearly indicates that the employees signed the agreements only after it was made clear that they would receive the same earnings as theretofore and because they felt there was no other recourse, having been told that otherwise the plan would be dropped and they would remain on the old scale for a 44-hour week and no overtime. Such assurance as to their earnings being given, I am of the view they received a continuing guarantee of their previous earnings and therefore that their actual and real rate of pay remained unchanged, and that this "agreed rate" of pay of defendant was devised, as was said by the court in Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 268, 79 L.Ed. 596, 97 A.L.R. 1355, to "exalt artifice above reality", as these rates had no other function in defendant's business.

The "bonus" is not in fact a bonus at all as that term is generally understood. That it had no relation to the value of the services of the employees, or to the quantity, or the quality of their work, is borne out by the following testimony of Mr. Brown, secretary and treasurer of the company:

"Q. Now, what was this bonus based on * * * the amount of work that these men did? A. No.

"Q. Did it have any relation to the quality of work that was done by the men? A. The bonus part did not have their rates reflected.

"Q. But the bonus, or the extra bonus had nothing to do with the production of the men? A. No.

"Q. It had nothing to do with the quality of the work of the men? A. No.

"Q. It had nothing to do with whether the work of the men was satisfactory? A. No."

The bonus could not be regarded as a gift or a gratuity, as defendant claims, as it is an essential characteristic of a gift that it be a transfer without consideration. It was in reality a part of the employees' regular compensation and must be included in determining the regular rate of pay. It was never regarded by the employees in any other sense but that it was given "to make up that money that we would otherwise have gotten at the old rate" per hour. When they figured whether they got enough in their checks, they divided it by the old rate "and it always came out right".

Defendant further argues that all Section 7 requires is payment of time and one-half overtime compensation and "it does not say that more cannot be paid by the company", thus inferring that the bonus is in effect additional overtime compensation. The evidence shows, however, that when no overtime is worked a bonus is still paid to make up the hourly rates received prior to September 1, 1938.

Defendant points out two or three instances where no bonus was added, the employees in those cases having earned an amount equal to or in excess of the old hourly rate multiplied by the number of hours worked. However, in order for the plan to work with such a result it is necessary that the highest paid employee (80 cents per hour), for example, work more than 56 hours per week, a 65 cents an hour man more than 60 hours, a 55 cents man more than 70 hours, and so on.

Defendant further argues that the Fair Labor Standards Act does not apply to firms paying in excess of the minimum wages prescribed in the act and quotes at length from Congressional debates which took place while the act was under deliberation to support this contention. I think this interpretation is contrary to the language of the act, which is explicit and unambiguous. Section 6 establishes a basic minimum wage which Congress considered essential to the health, efficiency and well being of employees engaged in interstate commerce or in the production of goods for commerce. In addition, Section 7 provides that employees shall not be worked longer than a specific number of hours per week "unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." This section does not purport to regulate wages but imposes a penalty on overtime work, regardless of what the rate of pay may be, thus making overtime work more costly to the employer and creating more employment by limiting the hours of labor. To accept defendant's reasoning would result in the defeat of one of the objectives for which the law was enacted since Congress obviously intended by this legislation to attempt to correct the conditions brought about by the twin evils of low wages and long hours. If an employer has a right to manipulate the rate base in the manner here resorted to, compliance with Section 7 would become solely a question of devising proper bookkeeping entries.

In my opinion the hourly or equivalent rates in effect prior to September 1, 1938, together with increases, if any, continue to be the measure of the compensation actually paid defendant's employees who were in its employ prior to that date, and are the regular rates at which these employees are actually employed; that defendant is paying its employees at these rates for all hours worked, and the employees are not receiving compensation for their overtime work at one and one-half times the regular rates of pay at which they are employed; and that defendant therefore has not met the requirements of Section 7 of the Act and is guilty of the violations of Section 15(a) (2) and 15(a) (1) of the Act as contended by the plaintiff.

I also necessarily find that defendant has violated Section 15(a) (5) of the Act in that its records do not show the true regular rates of pay of its employees and overtime compensation based on such rates, in conformity with the regulations prescribed by the Administrator pursuant to the authority granted him by Section 11(c) of the Act.

Findings of fact, conclusions of law and order for judgment granting the injunctive relief prayed for in the complaint, in conformity with the views herein expressed, will be filed. An exception will be accorded defendant.