**TENNESSEE COAL, IRON & R. CO. v. MUSCODA LOCAL NO. 123 et al. (FLEMING, Intervener).**

**SLOSS–SHEFFIELD STEEL & IRON CO. v. SLOSS RED ORE LOCAL NO. 109 et al. (FLEMING, Intervener).**

**REPUBLIC STEEL CORPORATION v. RAIMUND LOCAL NO. 121 et al. (FLEMING, Intervener).**

Civil Actions Nos. 5232–5234.

District Court, N. D. Alabama, S. D.

Aug. 13, 1941.

---

**6**

Borden Burr, Grady Patterson, Benners, Burr, McKamy & Forman, Ernest All, Sam Bronaugh, Bernard Monaghan, and Bradley, Baldwin, All & White, all of Birmingham, Ala., for plaintiffs.

Crampton Harris, of Birmingham, Ala., J. A. Lipscomb, of Bessemer, Ala., Lee Pressman and Joseph Kovner, both of Washington, D. C., and J. Q. Smith, W. F. Spencer, and Ralph W. Quinn, all of Birmingham, Ala., for defendants.

Jerome A. Cooper, of Birmingham, Ala., and Abner Brodie and Erwin B. Ellmann, both of Washington, D. C., for intervener.

MURPHREE, District Judge.

These cases, which were consolidated for trial, are actions for declaratory judgments. The plaintiffs are three corporations engaged, inter alia, in mining iron ore; they contend that the workweek of their underground ore mining employees does not include, within the meaning of Section 7 of the Fair Labor Standards Act of 1938, Title 29, U.S.C.A., § 207, that portion of the time spent by those employees in being transported and in walking to and from their usual working places. The defendants are labor unions, labor union officials, and individuals, who are representative of the general class of underground ore mining employees of the several plaintiffs. The defendants contend that the workweek of these employees includes all of the periods between the times when the miner reports for duty as required at or near the collar of the mine and when he reaches the collar at the end of the shift, except any fixed lunch period during which the miner is relieved of all duties, and also includes the aggregate of time spent on the surface in obtaining and returning lamps, carbide and tools, and in checking in and out. Because many persons in the class of the defendants are making actual claims upon the several plaintiffs for overtime compensation, based on the contention made by defendants in these actions, a justiciable controversy is presented.

The Administrator of the Wage and Hour Division of the United States Department of Labor has been permitted to intervene in each action, and he has made herein substantially the same contentions as have the several defendants.

The question presented is one of construction and application of the Fair Labor Standards Act of 1938 (hereinafter referred to as the Act). The important portion of Section 7 of the Act is:

"(a) No employer shall, except as otherwise provided in this section, employ any of his employees who is engaged in commerce or in the production of goods for commerce—

"(1) for a workweek longer than forty-four hours during the first year from the effective date of this section,

"(2) for a workweek longer than forty-two hours during the second year from such date, or

"(3) for a workweek longer than forty hours after the expiration of the second year from such date,

unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less

than one and one-half times the regular rate at which he is employed."

By the provisions of Section 3(g) of the Act, Title 29, U.S.C.A. § 203(g), "employ" is defined to include "to suffer or permit to work".

The plaintiffs, in order to prove their contended construction and application, adduced evidence of two kinds: (1) Evidence of an alleged custom or usage, with respect to the issues here presented, of a kind that the plaintiffs contend Congress must have adopted in Section 7; and (2) evidence of the activities of typical underground miners in the plaintiffs' ore mines, in order to prove that their travelling and walking time is not within the purview of the language of the Act.

The defendants' evidence has been to prove: (1) That no such custom as contended by the plaintiffs existed, and that if it did it may not be given the effect contended for by the plaintiffs, and (2) that the activities of the underground ore mine employees here in issue have in fact constituted part of their employment and workweek.

### 1. Custom or Usage

The plaintiffs' evidence as to custom or usage consists chiefly of the terms and agreements under which the defendants and their class of employees have worked and been paid, both by plaintiffs and other employers in the same industry. The plaintiffs contend that the custom has always and universally been such as to exclude any payment for the time spent by underground iron ore mine employees in walking and being transported to and from their usual working places, and to include only payment for time actually spent by such employees at their particular stations underground. The plaintiffs contend that this custom was so well established and understood that Congress must have adopted it in its use of the terms "employ" and "workweek" in Section 7 of the Act.

The evidence has disclosed no such custom. During the greater part of iron ore mining history in this district payment of the producing crews has been on a tonnage basis, the time spent by them at any place or places having no bearing whatsoever on their wages. At other times and places, payment was on a task basis, without regard to hours worked at any point. But plaintiffs place their greatest reliance of proof of custom upon the arrangements and contracts with the defendant labor unions under which the underground ore miners have worked for plaintiffs during the past several years. A typical provision of these contracts is: "Eight hours work per day shall constitute a day's work and forty hours shall constitute a week's work. The eight hours per day means eight hours of work at the usual working place, exclusive of the lunch period." This provision carries little weight in establishment of a custom not to pay for travel time, since in practice no record of the time spent "at the usual working place" has been kept and it was the exception rather than the rule that a man worked precisely eight hours at such a place. The actual practice under those contracts was for the company to arrange a shift which was supposed to run, by way of example, from 6:45 A. M. to 3:15 P. M. at the usual stations of duty underground, with thirty minutes off for lunch. The men in the working stations closer to the underground man unloading stations would usually actually arrive at their working stations before 6:45 A. M. and start working earlier than 6:45 A. M., the men in the furthest working stations would frequently actually arrive later than 6:45 A. M. Quite generally most of the producing crews left their particular stations before 3:15 P. M. In all cases the men were credited with exactly eight hours work, except in very unusual cases, although the time spent "at the usual working place" fluctuated thirty to forty-five minutes per shift as between men. Under these circumstances, regardless of the phraseology of the contracts, the pay was on a shift basis, rather than an hourly basis, and since some of the men did not spend a full eight hours at their particular stations, it cannot be categorically stated that they received no compensation for at least part of the time spent by them in travelling to and from their usual stations.

■ It cannot be said that any established usage existed in the method of pay that made it clearly understood, by those concerned with iron ore mining, that the time spent in being transported and walking to and from the usual working places was not work or time spent in the employ of the employer. No custom existed that would indicate that the phrases "employ" and "workweek", used in Section 7 of the Act, would be understood, in their application to underground iron ore

mining, to exclude such time from their purport.

■ Even if the mode of payment of these men did clearly exclude such time as employment and workweek time, it could not provide a controlling construction of Section 7 of the Act. The evidence clearly establishes that the methods of payment of wages were dictated almost entirely by the employers. The employees worked on the best terms they could obtain and the fact that they could not obtain terms that would compensate them for time spent in travelling underground to and from their working stations does not indicate that they did not consider that time as working time. It cannot be said that the way in which the iron ore miners have received their pay establishes, with their free and uncoerced agreement, the proposition that the time in question is not work time. Prior to the enactment of the Fair Labor Standards Act of 1938, iron ore miners repeatedly made efforts to obtain full, or at least a larger partial, compensation for so-called travel time. The fact that they were unsuccessful does not determine that they were erroneous in their contention that such time was work time, nor does it determine that Congress, in using the phraseology of Section 7 of the Act, adopted the prevailing method of payment. Since the usual methods of payment were not arrived at by unhampered consent of the workers, it would be no more reasonable to assume that Congress, in the Fair Labor Standards Act, adopted the employers' formula than to assume that Congress intended to remedy the practice so far as it may have denied compensation for actual work. That Congress has the authority to abrogate such a practice was made clear in Holden v. Hardy, 169 U.S. 366, 397, 18 S.Ct. 383, 390, 42 L.Ed. 780, where the court said: "The legislature has also recognized the fact, which the experience of legislators in many states has corroborated, that the proprietors of these establishments and their operatives do not stand upon an equality, and that their interests are, to a certain extent, conflicting. The former naturally desire to obtain as much labor as possible from their employés, while the latter are often induced by the fear of discharge to conform to regulations which their judgment, fairly exercised, would pronounce to be detrimental to their health or strength. In other words, the proprietors lay down the rules, and the laborers are practically constrained to obey them. In such cases self-interest is often an unsafe guide, and the legislature may properly interpose its authority."

■ No matter how strong a custom existed as to payment of ore miners, if the activities here in issue actually constituted employment and work, it could not be contended that the custom prevailed to deny the defendants compensation for the time consumed thereby. An occupational custom or usage cannot operate to avoid the mandate of an Act of Congress. United States v. Houston Belt & Terminal Ry. Co., 5 Cir., 1913, 205 F. 344; Ramsauer v. United States, 9 Cir., 1927, 21 F.2d 907. See Holden v. Hardy, supra. Especially is this true in the case of the Fair Labor Standards Act, which is clearly remedial in character. Fleming v. Carleton Screw Products Co., D.C.Minn.1941, 37 F.Supp. 754. The Act was established for the avowed purpose of eliminating detrimental labor conditions (Section 2 of the Act, Title 29, U.S.C.A. § 202) and it would be a mockery of the beneficent purposes of the Act if the provisions prohibiting employment for over a specified number of hours for each workweek, except at an increased rate of compensation, were held to incorporate a custom to pay employees only for a part of the time worked by them. Assuming the time in question is actually working time, there can be no doubt that it must be considered as a part of the workweek within the terms of the Act, and the alleged custom could not avoid the remedial effects of the Act.

Evidence has been introduced of administrative applications of other and similar laws, limiting or specifying hours of labor, to other situations. Because the facts in those cases to which those administrative applications were made, were quite different from the facts of the present cases, little light on the proper construction and application of the Fair Labor Standards Act to these cases has been shed by this evidence.

In the last analysis, therefore, plaintiffs must stand or fall on the question whether the time in issue was employment and work, as a matter of simple fact.

## 2. Activities Constituting Work.

■ No serious conflict of evidence is apparent as to the liability of the plaintiffs for payment to their underground ore mining employees for the aggregate of time

spent on the surface in obtaining and returning lamps, carbide and tools and in checking in and out. The plaintiffs' evidence with respect to this time has been that the employees in question only occasionally obtained and returned tools on the surface, and that obtaining and returning carbide and lamps and checking in and out only consumed short periods of time. Certainly the infrequency of activities or the speed with which they can be performed will not change their essential nature as work, and it seems an inescapable conclusion that the activities mentioned are obviously work. They are performed on the premises of the employer, in the furtherance of the employer's business, with no benefit to the employee (except to aid him in the performance of work for the employer), under conditions created and controlled by the employer, and they involve responsibility to the employer and physical exertion, even though not burdensome, on the part of the employee. No characteristic of work is lacking. This time must be included in the workweek of the employees represented by the defendants.

■■■ The second element of time which plaintiffs seek to have adjudicated as not within the workweek is the time spent by the underground ore mining employees in being transported from the surface to points at varying distances below the surface and back again at the end of the shift. In the same category must be considered supplemental rides given the men on the way to and from their underground stations between underground points. The plaintiffs ask for a declaration from this court determining whether this transportation time is within the workweek, without consideration of the actual conditions and manner in which the transportation has occurred. This court is not empowered to make such a declaration. Jurisdiction is delimited by the bounds of the actual controversy presented, and to attempt adjudications beyond those bounds could not be a proper judicial function. See: Aetna Life Ins. Co. v. Haworth, 1937, 300 U.S. 227, 240 et seq., 57 S.Ct. 461, 81 L.Ed. 617, 108 A.L.R. 1000. The actual controversy concerns only the working time of the underground iron ore mining employees in the plaintiffs' iron ore mines, during the time between the effective date of the Act and the commencement of these actions, where and when

certain conditions and activities existed and occurred. It is with reference to these conditions and activities, and not with reference to some hypothetical future circumstances, that we must deal with the questions here presented.

It is particularly important in these cases that the problem be approached in this factual manner, because transportation in the abstract might be construed to be a restful and pleasurable activity for the passengers. In the underground ore mines of the plaintiffs and in the manner in which the underground ore mining employees have been transported, the reverse has been true. The cars in which the employees have been transported have not been designed for comfort, have frequently been merely ore cars bearing remnants of iron ore muck. The cars have been nearly always crowded to the extreme. The positions which the men have been required to assume during the transportation varies from a crouch with their bodies overlying one another to a rigid propping of legs and arms against the sides of the car and the fellow passengers. These positions were assumed partially because of the press of human bodies in the cars and partially because of the necessity of keeping head and body in a deflected position in order to avoid injury from collision with low points in the roofs of the mine slopes or with projections from the roofs. These conditions have occasionally resulted in injuries of various kinds to the employees when the required degree of restraint and alertness has been relaxed. The trips were, of course, in the comparative darkness and enclosure of an artificially lighted mine. The air was humid and malodorous, the ventilation relatively poor and the heat increasing with the descent into the mine. These conditions are recited not for the purpose of censure of the plaintiffs' manner of maintenance of their mines, for these conditions may well be normal conditions in iron ore mines and practically inevitable. Nevertheless, the conditions are clearly conditions peculiar to the occupation of the men in the class represented by the defendants, conditions replete with hazards, conditions requiring physical exertion and mental alertness, and conditions unpleasant and burdensome to those encountering them.

The evidence has made clear that the transportation was had under the strict control and supervision of the plaintiffs.

The plaintiffs prescribed the schedule of the trips, the speed of the trips, the loading of the men into the trips, the rules of conduct during the trips, and in most cases required the men to ride the trip rather than walk. The plaintiffs contend that these were safety measures that would be applicable to any outsider coming into the mines. But the controls of the plaintiffs over the trips were clearly exercised in the interest of efficient operation of their mining business. Too, it is significant to note that infractions by employees of plaintiffs' controls over these trips caused such employees to be subjected to the discipline of the plaintiffs. Clearly, during the trips, up and down, the men were under the complete supervision of the plaintiffs. This conclusion is emphasized by the fact that frequently men were given their first instructions of the day prior to commencement of their trip down the slope, and it appears that they were always subject to such instructions on the surface regardless of the frequency with which explicit instructions were actually given. This fact further indicates that the employees on the trips down into the mines were engaged in and about the business of the plaintiffs.

We must conclude that the time spent in this type of transportation is worktime. It bears in a substantial degree every indicia of worktime: supervision by the employer, physical and mental exertion, activity necessary to be performed for the employers' benefit, and conditions peculiar to the occupation of mining. While time consumed in such transportation is not itself part of the time consumed in the actual production of ore, yet such time is a necessary and incidental part of the actual production of ore.

We do not mean to indicate that every detail of the conditions and activities referred to are requisite to constitute this travel time worktime, because these conditions have varied slightly from mine to mine and from time to time. But these details have generally prevailed, and even the minimization of the essential elements of work, which have here usually been present in some degree, does not change the conclusion that work has in fact been performed. See: Missouri, K. & T. Ry. Co. v. United States, 1913, 231 U.S. 112, 34 S. Ct. 26, 58 L.Ed. 144.

■ The final element of time in issue is the time spent in walking between the points underground at which the men were unloaded on the way in and loaded on the way out and the points at which the men were stationed, i. e. between the underground manloading station and the particular working places.

During these walks, the physical conditions encountered by the men were even more difficult than during the part of the descent spent in riding. The atmosphere becomes warmer and more humid, the ventilation even less effective and the air fetid. The roof is low in places, requiring the walkers to stoop. The footing is irregular, sometimes rough, sometimes wet and slippery, overhead wires (often not insulated or guarded) and pipes must be carefully avoided. The passageways are up and down grades of varying steepness. In short, a very substantial amount of physical and mental energy is required during this walking.

What has been said of the supervision by the employer of the time during which the men are transported up and down the main slope applies equally to the walking time of the men away from and back to the slope.

We find that the time consumed by the men in walking from the underground manloading station to their usual working places and back again at the end of the shifts, was part of their employment and was worktime.

■ We conclude that the fixed lunch periods of one-half hour during which the employees have been relieved of all duties are not part of their employment or of their workweek.

The conclusions here stated have been reached by examination of the facts existent in the plaintiffs' mines during the period in which the underground ore miners are claiming that they earned unpaid compensation for overtime work under the provisions of the Fair Labor Standards Act. It may be helpful, however, to observe that these conclusions are the same as those announced in the summary of the so-called "modified portal to portal" opinion of the Administrator of the Wage and Hour Division of the United States Department of Labor on March 15, 1941, which summary is as follows:

"The workday in underground metal mining starts when the miner reports for duty as required at or near the collar of the mine, and ends when he reaches the collar at the end of the shift.

"The workday also includes the aggregate of the time spent on the surface in obtaining and returning lamps, carbide and tools, and in checking in and out.

"The workday does not include any fixed lunch period of one-half hour or more during which the miner is relieved of all duties, even though the lunch period is spent underground."

■ The defendants have filed counterclaims against the plaintiffs for themselves and others entitled to compensation for overtime worked, by virtue of the fact that the time and activity put in issue by plaintiffs' complaints constitutes employment and work. Since we have concluded that the defendants are correct in their general position, these counterclaims will be set down for separate trial and judgment at a convenient date. See Rule 42(b), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

Findings of fact, conclusions of law and declaratory judgments, in conformity with this opinion, will be entered in each of these actions.